**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **RIGOBERTO BARRIENTOS,** | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **C.A. NO. 5:23-cv-68** |
| | § | |
| **ZAPATA COUNTY,** | § | |
| **RAYMUNDO DEL BOSQUE, Jr.** | § | |
| **JOSE "JOEY" MARTINEZ,** | § | |
| **HECTOR SOLIS,** | § | |
| **JOSE RAMIREZ,** | § | |
| **And ARIEL GONZALEZ,** | § | |
| **Defendants** | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

1.     Plaintiff Rigoberto Barrientos brings this Second Amended Complaint and Demand for Jury Trial against Zapata County, Texas, and, in their individual capacities, Zapata County Sheriff Raymundo Del Bosque, and four of his sheriff's deputies: Jose "Joey" Martinez, Hector Solis, Jose Ramirez,[1] and Ariel Gonzalez.  This 42 U.S.C. § 1983 civil rights suit for violations of the First and Fourth Amendments stems from an inexplicably violent and illegal arrest that left Mr. Barrientos with an amputated leg and fighting for his life.

## INTRODUCTION

2.     The heart of this lawsuit is that four poorly trained and inadequately supervised Zapata County sheriff's deputies used catastrophic—even deadly—force to arrest Plaintiff Rigoberto

---

[1] Plaintiff has previously named this defendant "Pepe Ramirez." In his pre-answer motion to dismiss, Mr. Ramirez clarified that "Pepe" is a nickname and that he is properly named "Jose Ramirez."

1

Barrientos despite lacking reasonable suspicion or probable cause that a crime had been committed and while under no threat or danger from a peaceful, unarmed citizen. The official arrest report admits, and police body cameras confirm, that the triggering event for Mr. Barrientos' detention or arrest was a non-threatening statement about gender rights during domestic disturbance calls. Zapata County, through its Sheriff's Office, bears responsibility for the deputies' actions because Sheriff Del Bosque either condones or is deliberately indifferent to the use of excessive force, failing to adequately supervise, train, or discipline his deputies in this regard.

3.      Specifically, Mr. Barrientos brings the following claims under 42 U.S.C. § 1983:

    • **Count I:**      Fourth Amendment claims against Deputies Martinez, Solis, Ramirez, and Gonzalez, individually, for (1) false arrest or detainment, and (2) use of excessive force.

    • **Count II:**      First Amendment claim against Deputies Martinez, Solis, Ramirez, and Gonzalez, individually, for retaliation against Mr. Barrientos for exercising his First Amendment free speech rights.

    • **Count III:**    Civil conspiracy claim against the four deputies, in their individual capacities.

    • **Count IV:**    Claim against Sheriff Del Bosque, individually, for failure to supervise, train, or discipline his officers on use of force and falsifying reports.

    • **Count V:**    *Monell* claim against Zapata County for fostering and ratifying the pervasive and well-known customs and practices of (1) false arrests or detainments and (2) excessive force by sheriff deputies, which includes failure to train, supervise, or discipline in this regard. Alternatively, these are each a "single incident" claim for the same unconstitutional acts under *Monell.*

4.      As detailed below, the amount of force used to arrest or detain Mr. Barrientos at his home on February 26, 2022, shocks the conscience. Acting in unison, the four deputy defendants snapped Mr. Barrientos' left leg almost completely off his body during a savage takedown. In police body

camera video acquired by Plaintiff, one both sees and distinctly hears the crunch and crack of bone and popping of burst tendon, muscle, ligament, and skin when the four large, heavily muscled deputies combined their strength and body weight to split Mr. Barrientos' leg in half as they propelled him with deadly force toward the concrete slab below.

5.     The capriciousness of the deputies' assault truly relegates this case to the darker annals of police brutality.   At the time of their attack the deputies had already investigated ***and cleared*** Mr. Barrientos of any crime related to why they were on the scene in the first place: a routine call about a non-violent domestic disturbance made by Mr. Barrientos' live-in girlfriend in the early morning hours of April 26, 2022.

6.     As the video establishes, Mr. Barrientos was calm and measured throughout his investigatory detention.  In the video, his now former girlfriend was also calm and repeatedly told deputies that the couple had not been physical with one another.  Mr. Barrientos stood placidly underneath his home's well-lit carport, uncuffed, and deferentially engaging with officers throughout the encounter.  Until the instant of arrest, all parties present appeared in complete agreement that the best solution was Mr. Barrientos packing a bag and the couple separating for the night.

7.     After interviewing his girlfriend and completing their investigation, the deputies repeatedly assured Mr. Barrientos that he was not under arrest and would not be taken to jail.  Indeed, they had just offered him a courtesy ride to a relative's home when the main instigator of the assault, Deputy Martinez, became upset with Mr. Barrientos' statement or viewpoint that as the "hombre" (the man) the couple's home was his house too.

3

8.     Disagreeing with this viewpoint, Deputy Martinez demeanor immediately changed, and he told Mr. Barrientos that his opinion didn't matter.  When Mr. Barrientos asked "why"—as in why didn't it matter—Deputy Martinez unexpectedly retaliated by arresting Mr. Barrientos in violation of the First and Fourth Amendments.  Again, there was no raised voice, no threats, no disobeyed order, and no aggressive posturing by Mr, Barrientos—he was simply, and wrongfully, arrested without probable cause for expressing an opinion that Deputy Martinez disliked for whatever reason.

9.     Within seconds, all four deputies then employed a violent takedown maneuver that nearly killed Mr. Barrientos and has crippled him for life, thereby violating the Fourth Amendment again. Upon hitting the concrete floor, Mr. Barrientos immediately began bleeding to death from his nearly severed leg.  As captured by the video, deputies were forced to put not one but *two* tourniquets on him as he lay face down in a massive, expanding pool of his own blood.  Yet, as he observed their terrible handiwork, Deputy Martinez told his colleagues that he found the other deputies' shock and surprise at the damage they'd wrought *amusing*: "I'm smiling … I am laughing," he said to them on video.

10.     When an ambulance arrived a few minutes later, Mr. Barrientos' handcuffs were removed, and all four defendant deputies repeatedly told EMS workers and each other that the victim of their bloody assault was *not under arrest*.  Again, there was no discussion of Mr. Barrientos acting aggressively, squaring up to fight, or even struggling in the immediate aftermath of what occurred.

11.     Rigoberto Barrientos was taken by EMS from his home in Zapata County to Laredo Medical Center, an hour away.  To save his life, doctors there quickly rushed Mr. Barrientos

4

onward to University Hospital in San Antonio, where his leg was amputated. Mr. Barrientos spent the next month hospitalized, racking up approximately half a million dollars in medical bills.

12.     A modest laborer, Mr. Barrientos has been unable to work since his assault and remains largely unemployable due to disability. He cannot pay his medical bills. He has been consigned to a life of grinding poverty, debt, pain, physical deformity, and emotional trauma due to the actions of Defendants in this case. He fears speaking with or expressing opinions to law enforcement. He is now a burden on his family and friends, and deeply traumatized, humiliated, and depressed. Mr. Barrientos and, indeed, the entire community of Zapata deserves justice in this case because no citizen—*no town*—should be forced to endure a Sheriff's Department that promotes such a culture of violence and abuse.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1343 because the controversy arises under the U.S. Constitution and 42 U.S.C. § 1983.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to Mr. Barrientos's claims happened within this district.

15.     Declaratory relief is authorized by 28 U.S.C. § 2201. A declaration of law is necessary to determine the rights and duties of the parties.

## PARTIES

16.     Rigoberto Barrientos is a natural person who is and was at the time of the incident domiciled in Zapata, within the Southern District of Texas.

17.     Defendant Zapata County is a Texas county and local government entity existing entirely within the Southern District of Texas.

5

18.     Defendant Raymundo Del Bosque is currently and was at the time of the incident described in this Complaint the elected sheriff of Zapata County.  He is sued in his individual and official capacity.

19.     Defendant Jose "Joey" Martinez is currently and was at the time of the incident described in this Complaint a deputy with the Zapata County Sheriff's Office.  He is sued in his individual capacity.

20.     Defendant Hector Solis is currently and was at the time of the incident described in this Complaint a deputy with the Zapata County Sheriff's Office.  He is sued in his individual capacity.

21.     Defendant Jose Ramirez is currently and was at the time of the incident described in this Complaint a deputy with the Zapata County Sheriff's Office.  He is sued in his individual capacity.

22.     Defendant Ariel Gonzalez is currently and was at the time of the incident described in this Complaint a deputy with the Zapata County Sheriff's Office.  He is sued in his individual capacity.

23.     Defendants are persons for purposes of 42 U.S.C. § 1983. The individual defendant officials were, at all relevant times, acting under the color of state law in their capacity as Sheriff or Deputy Sheriffs for the Zapata County Sheriff's Office and their acts or omissions were conducted within the scope of their official duties or employment.  (Defendant Zapata County, being a local government entity, only acts under color of state law.)

## FACTUAL ALLEGATIONS

24.     Rigoberto Barrientos is and was a resident of Zapata, Texas.

25.     At the time of the incident, Mr. Barrientos was employed as a laborer and construction worker.  He depended on his mobility and strength to earn a living.

26.     Mr. Barrientos lived with his girlfriend, Gloria Alaniz, at 507 Laredo Avenue, Zapata, Texas 78076.

6

27.     In the early hours of February 26, 2022, Mr. Barrientos and Ms. Alaniz were at home drinking, breaking off their relationship, and arguing about it.  Ms. Alaniz worried about the argument escalating, she said, and called the cops.

28.     Responding to a dispatch call, the first officer to arrive at their home was Deputy Martinez. A body camera video of his arrival is time-stamped at 3:15 AM.

29.     It is unclear from other police body camera footage whether another deputy was partnered with Martinez in his vehicle, but the collective videos make it clear that all four deputies were on the scene within a few minutes and well prior to Mr. Barrientos' assault.

30.     As Deputy Martinez approached the home, he crossed a cemented carport/front porch area that was well-lit.  In addition, interior lights shone from an open front door, providing visibility indoors as well.

31.     Upon noticing Deputy Martinez, the couple met him at the door and, at 3:16 AM, Mr. Barrientos stepped outside to visit with the deputy.

**Barrientos' period of investigatory detention begins.**

32.     For the next two minutes, the two men had a normal conversation, the crux of which was that Mr. Barrientos was ready to pack some clothes and spend the night elsewhere.

33.     At no point was Mr. Barrientos acting erratically or in a threatening manner.

34.     At 3:17 AM, Deputy Martinez even offered to give Mr. Barrientos a ride to stay the night somewhere else, and a minute later stated that "if we can get your sister to come and get you, we are going to do that."

35.     At no point was Mr. Barrientos placed in handcuffs or asked to sit in a squad car.

36.     While Mr. Barrientos was not told he was under "investigatory detention" or that he could not leave, at no point did Barrientos leave or attempt to leave.

37.     In fact, once Mr. Barrientos walked to the end of the carport away from the house with Deputy Martinez, he basically stood stationary on the same spot for the rest of the police encounter.

38.     Mr. Barrientos repeatedly referred to all deputies, including Deputy Martinez, respectfully as "boss."

39.     At 3:18 AM, the other deputy defendants arrived.

40.     At that point, Deputy Martinez went inside to visit with the girlfriend, Gloria Alaniz, while Mr. Barrientos waited outside on his spot, chatting conversationally with the other deputies.

41.     Deputy Gonzalez, although still outside, positioned himself next to the open front door within easy earshot of the girlfriend's interview.

42.     Ms. Alaniz also had a calm, collected conversation with Deputy Martinez. She was asked repeatedly if there was any physical confrontation with Mr. Barrientos or if he specifically threatened her with physical harm. She repeatedly answered in the negative.

43.     Deputies Martinez and Gonzalez were able to assess the scene indoors and all deputies observed Mr. Barrientos and the home's exterior.

44.     There were no signs of a physical struggle either inside or outside the home or on the persons of either Mr. Barrientos or Ms. Alaniz.

45.     Neither resident exhibited bruising, pain, or fearful behavior prior to Mr. Barrientos' arrest.

46.     Ms. Alaniz told Deputy Martinez that she supported Mr. Barrientos spending the night elsewhere and that she was agreeable to his coming inside to pack some clothes before departing.

47.     At 3:21 AM, Deputy Martinez ended his interview with Ms. Alaniz and went back outside to rejoin the conversation with Mr. Barrientos.

**Barrientos' investigatory detention ends.**

8

48.　Still at 3:21 AM, Deputy Martinez next asked Mr. Barrientos if he wanted to call his sister to come pick him up or get a ride with Deputy Martinez.

49.　Mr. Barrientos then attempted to use his cell phone to call his sister, but the phone's battery had died.

50.　To the extent that Mr. Barrientos had been under investigatory detention, the deputies ended the detention on telling Barrientos he was not under arrest and could leave.

51.　Thus, any reason to arrest Mr. Barrientos necessarily would had to have occurred from this point forward in the facts (i.e., 3:21 AM through his arrest at 3:23 AM).

**Deputies Admit: No probable cause or reasonable suspicion.**

52.　From here, this Complaint's Factual Allegations will delineate time down to the second to give the Court an accurate picture of just how rapidly the Zapata County sheriff's deputies escalated a calm, easy to manage situation into a violent nightmare.

53.　At 3:22.56 AM, the deputies again tell Mr. Barrientos, "We can give you a ride … We are not taking you to jail."

54.　When Mr. Barrientos expressed suspicion about the courtesy ride offer, Deputy Martinez and another deputy assured Barrientos that they were not trying to trick him and that he was not under arrest.

55.　None of the deputies issued an order or otherwise explained to Mr. Barrientos that he was required to accept a courtesy ride or go to jail.  No one said, "it's time to go" or "get in the car."

**First Amendment retaliation occurred.**

56.　Instead, from 3:23.16 AM to 3:23.29 AM, Mr. Barrientos and Deputy Martinez had a brief but fateful exchange of opinion, a 23-second conversation that nearly ended a man's life.

57.     When asked by Deputy Martinez who owned the home, Mr. Barrientos accurately replied that his girlfriend did.  Mr. Barrientos also stated his viewpoint that he was the "hombre" or man of the house.

58.     Suddenly, Deputy Martinez's voice changed and, clearly agitated, he responded that this didn't matter.  When Barrientos asked "why"—as in why didn't this matter—Deputy Martinez abruptly ordered him to put his hands behind his back.

59.     Despite their immediate proximity to events, none of the other deputies intervened to question probable cause, reasonable suspicion, or any aspect of Deputy Martinez's decision to suddenly arrest Mr. Barrientos for expressing a viewpoint.  Instead, they all assisted Deputy Martinez by grabbing Mr. Barrientos.

60.     Jumping ahead, Deputy Martinez later lied about this exchange in his arrest report, falsely stating that Mr. Barrientos had "squared up to Sgt. Martinez and stated "que (why)," as if he wanted to fight Sgt. Martinez."  The video, however, doesn't lie—it shows absolutely nothing of the sort occurred.

61.     What the video shows is that Mr. Barrientos' demeanor, posture, position, tone of voice, and choice of words did not become more tense or confrontational at any time during the police encounter, much less during these last few seconds prior to arrest.

62.     When he was arrested at 3:23.29 AM, Mr. Barrientos posed no more threat to the deputies than at any other point in the video and arguably even less since all four officers were surrounding him.

63.     Again, Mr. Barrientos never refused an order to accept a courtesy ride, was never ordered into a police vehicle, and did not attempt to flee or leave the scene.  Likewise, he did not threaten to return to his house or hurt anyone.

10

64.     Deputy Martinez's fabrication notwithstanding, no reasonable officer would interpret Mr. Barrientos' calmly presented viewpoint as "squaring up to fight," especially against a police officer in the immediate presence of three large fellow officers.

65.     Mr. Barrientos, therefore, was arrested for simply expressing a viewpoint Deputy Martinez did not like, which was a textbook case of First Amendment retaliation.  There was no other intervening event, action, or statement that might have justified or explained why Barrientos was taken into custody—and, importantly, none other were mentioned in the official arrest report either.

66.     Again, the sole basis for arrest noted in the official report, was Deputy Martinez's flimsy and easily disproved allegation that Mr. Barrientos "squared up" as if he wanted to fight.

**The deputies' takedown was unnecessary and deadly.**

67.     Mr. Barrientos, indeed, did not fight with any deputy.  Instead, he was ordered to put his hands behind his back and did so right away.

68.     As the four deputies grabbed and jostled Mr. Barrientos, however, the video shows him stiffen.  For this, he was told to "quit resisting" as four different deputies exerted competing tension on his arms, frustrating his ability to comply.[2]

69.     At 3:23.35, Deputy Martinez announced to the other deputies and Mr. Barrientos, "I am going to take you down."  This was 6 seconds after ordering Barrientos to put his hands behind his back.

---

[2] 1 *See, e.g.,* Lisa Cacho & Jodi Melamed, *How Police Abuse the Charge of Resisting Arrest,* Boston Review, June 29, 2020, http://bostonreview.net/race-law-justice/lisa-cacho-jodi-melamed-how-police-abuse-charge-resisting-arrest; Scott Holmes, *Resisting Arrest and Racism – The Crime of "Disrespect"*, 85 UMKC L. Rev. 625 (2017); Jonah Newman, *Chicago police use 'cover charges' to justify excessive force,* Chicago Reporter, Oct. 23, 2018, https://www.chicagoreporter.com/chicago-police-use-cover-charges-to-justify-excessive-force/.

70.    In the seconds that followed, Mr. Barrientos remained fearful and tense but did not wrestle with the deputies, threaten anyone, or attempt to flee.

71.    Mr. Barrientos was 5'8" and Deputy Martinez, the largest of the four deputies, was approximately 6'4" (according to the process server description in this case).  On the video, he can be seen towering over Mr. Barrientos.  Between the four officers, they had Mr. Barrientos in complete control.

72.    Mr. Barrientos, who was scared, pleaded with the deputies in Spanish, "calmate, calmate" (take it easy, take it easy).  He was right to fear for life.

73.    At 3:23.48, Deputy Martinez initiated a deadly, violent takedown by sweeping his own leg into the front of Mr. Barrientos' left knee so as to hyper-extend it backward in the wrong direction.  In unison, all four deputies then brought their combined weight to bear on Mr. Barrientos, propelling the Plaintiff's head, neck, and upper body violently downward toward the concrete slab.

74.    No doubt preventing imminent head and spinal injury, Mr. Barrientos' left knee—pinned in place by Deputy Martinez's leg-sweep maneuver—momentarily absorbed enough of the officers' tremendous force to slow Barrientos' fall before giving out and snapping almost completely off.

75.    By 3:23.56, Mr. Barrientos was lying face down in a rapidly expanding pool of his own blood.  He was bleeding to death.

76.    Deputies immediately secured two police-issued tourniquets to Mr. Barrientos' left thigh near his femoral artery.

77.    An ambulance was summoned and arrived within a few minutes.  On video, all four deputies repeatedly told EMS personnel, each other, and an unidentified fifth sheriff deputy newly arrived on scene that Barrientos was "not under arrest,' "not arrested," and "not in custody."

Handcuffs, thus, were removed from the prostrate Mr. Barrientos and within 15 minutes he had begun the hour-long drive to Laredo Medical Center.

78.     A few hours after being stabilized by emergency room doctors in Laredo, Mr. Barrientos was rushed to University Hospital San Antonio for further life-saving emergency care.

79.     Sadly, doctors in San Antonio quickly concluded that to save Mr. Barrientos' life, they needed to amputate his left leg.

80.     What followed was an agonizing, lonely month of pain and trauma for Mr. Barrientos at University Hospital, far away from friends, family, and the life he had known.

81.     His medical bills for this stay alone were nearly $500,000 and he will need a lifetime of medical procedures, home care, pain management, psychological help, and vocational therapy.

82.     Mr. Barrientos now fears speaking with or expressing opinions to law enforcement or powerful government officials, generally.  He suffers from PTSD.  He feels ashamed to be a burden on his family and friends, and is deeply traumatized, humiliated, and depressed.  He is deformed.

83.     He is drowning in debt and unable to work. Mr. Barrientos lives in abject poverty and today is wholly dependent on the kindness of others for subsistence.

### The deceitful police report.

84.      Deputy Jose "Joey" Martinez is or was under federal investigation[3] for lying on arrest reports to cover up his repeated use of excessive force.

85.     Deputy Martinez's arrest report filed in this case painted an untrue picture that Mr. Barrientos acted aggressively toward police.  The word "aggressive" appeared repeatedly throughout the report, despite body camera videos showing the opposite was true.

---

[3] According to the Texas Rangers, they opened an investigation against Deputy Martinez but ultimately referred the case to the FBI and the U.S. Attorney's Office.

13

86.     As noted earlier, to justify the arrest of Mr. Barrientos, Deputy Martinez falsely claimed in his official report that Barrientos "squared up to Sgt. Martinez and stated "que (why)," as if he wanted to fight Sgt. Martinez."[4]  The video shows no "squaring up" or any other indication that Mr. Barrientos wanted to fight—and, as further proof, Mr. Barrientos did not fight, or even pull back, when Deputy Martinez grabbed him to put on handcuffs.  "Squaring up to fight" was a lie that Deputy Martinez told to hide the absence of probable cause.

87.     Recounting the conversation in greater detail, Deputy Martinez wrote:

> "Sgt. Martinez then advised Barrientos we weren't there to mess him up that we just wanted to give him a ride.  Barrientos then stated "esque nesita que entender whats up tas en mi casa bro." Sgt. Martinez then advised Barrientos that the house belongs to Alaniz in which Barrientos stated "es su casa pero yo soy el hombre right." Sgt. Martinez then stated to Barrientos that what does that have to do with anything, and ***Barrientos then squared up to Sgt. Martinez and stated "que," as if he wanted to fight.***  Sgt Martinez then attempted to handcuff Barrientos."

88.     The arrest report also only charged Mr. Barrientos with "Resisting Arrest." While not legally viable as a stand-alone charge (a person must be arrested for something else *first*, and only then can criminally resist), this manufactured "resistance" perfectly captured the lack of probable cause and absence of any underlying crime in this case.

89.     It is now more than a year since his assault, and still no criminal charges have been filed in this case—at least against Mr. Barrientos, that is.

---

[4] As explained later, Deputy Martinez admitting in his report that he arrested Barrientos for these purported "fighting words" would only be valid if actual "fighting words" were said per First Amendment law.  These words, however, weren't even close.

14

**Damages.**

90.      As a result of Defendants' conduct, Mr. Barrientos has incurred nearly $500,000 in past medical bills and will need future medical treatments and surgeries.  His life span and quality of life have been drastically degraded.  Mr. Barrientos is no longer employable as a construction worker or laborer.  Mr. Barrientos experienced and experiences acute and prolonged physical pain and suffering.  His body is deformed and disfigured.  Mr. Barrientos also suffered and suffers mental anguish, emotional distress, and loss of consortium.   He lives in abject poverty, debt, pain, and fear.

**Custom of excessively violent takedowns.**

91.      Sheriff Del Bosque has been accused of tolerating and creating a culture of excessive force since his days as Chief Deputy back in 2018: "Chief Deputy Raymundo Del Bosque Jr. failed to enforce pre-existing policy to discipline the use of excessive force, adequately train officers on the use of such force, and/or respond to complaints of such force."[5]

92.      In addition to Mr. Barrientos' case, Plaintiff's counsel also represents five other *misdemeanant* clients from Zapata County with excessive force claims pending or in process against Zapata County sheriff deputies:

- Baldomero Flores:  Client suffered broken ribs from an excessive force takedown by defendant Deputy Martinez that is under active FBI investigation as to whether he lied in the arrest report to coverup excessive use of force against another compliant arrestee. The incident occurred in early February 2022 to the best of Mr. Flores' recollection (to date, Zapata

---

[5] Maria Gardner, *Lawsuit Claims Police Brutality*, Laredo Morning Times (July 1, 2018), http://digital.olivesoftware.com/Olive/ODN/LaredoMorningTimes/shared/ShowArticle.aspx?doc=HLMT%2F2018%2F07%2F01&entity=Ar00104&sk=9B62C9A5&mode=text

County has refused to turn over any police records whatsoever, frustrating our ability to provide a firm date here).

- Cristobal Pena: Client suffered a broken hand and head trauma from an excessive force takedown and beating by Deputy Dominic Madrid while in handcuffs on February 18, 2023. Mr. Pena, in a bewildering case, was a homeowner arrested without probable cause at the behest of a trespasser—unsurprisingly, he was never charged or jailed, just beaten to the point he needed hospital care.

- Jason Longoria: Client suffered extensive soft tissue injuries and burns from an excessive force takedown, beating, and tasering while in handcuffs on November 8, 2022. (Zapata County has refused to turn over any police records whatsoever, frustrating our ability to identify the officers involved).

- Abraham Prezas: Client suffered a dislocated shoulder and head injury on February 4, 2023, from an excessive force takedown and beating while in handcuffs by Deputy Dominic Madrid.

- Javier Munoz: Client suffered broken and bulging vertebrae and other head and spinal injuries from an excessive force takedown and beating while in handcuffs by Deputy Dominic Madrid on May 26, 2022. (Zapata County has refused to turn over any police records whatsoever, frustrating our ability to identify other officers involved).

93.    According to the U.S. Census Bureau, Zapata County's population from a June 2022 estimate was 13,849. On a per capita basis, undersigned counsel having six (6) excessive force takedown cases, each involving 2-4 deputies, that all occurred over the last 18 months is evidence that an unconstitutional pattern and practice existed and exists in the Zapata County Sheriff's Office. By way of comparison, Harris County, Texas (population 4.78 million) would have to

reach 2,070 excessive use of force cases over 18 months to match this ratio. It also bears repeating that we aren't even comparing Harris County with anything approaching the actual numbers of excessive force cases from Zapata County. Without the benefit of discovery, Mr. Barrientos' side of this troubling equation is currently confined to a single group of victims that managed to find help from two lawyers located well outside of the South Texas region.

94.     It seems inconceivable that a court would simply *dismiss* a pattern-and-practice case against the Harris County Sheriff if presented with 2,070 excessive use of force cases over an 18-month period. Zapata County has a problem of at least this proportion and magnitude (and almost certainly far greater), despite Defendants protestations that the number of incidents under their watch has been "remarkably few."

**Condoning excessive force**

95.     This culture and practice of excessive force takedowns have been directly encouraged by Sheriff Del Bosque. Immediately after taking office on January 1, 2021, the Sheriff began the glorification of dramatic takedowns while starring in a violent reality television ride-along show called "La Ley de Zapata" on NBC Universo. Sheriff deputies who performed forceful takedowns were featured in dramatic set-pieces during program filming, as can be seen in a series intro-clip.[6] Deputies that followed Sheriff Del Bosque's order to be "more productive" in the performance of entertaining search and seizures were held in higher esteem by Sheriff's Office leadership than those who followed standard operating procedures, according to one former show participant.

96.     Sheriff Del Bosque's star-turn as a television tough-guy was squelched on May 26, 2021, however, when Texas passed a law prohibiting the production of police ride-along reality television programs specifically due to the excessive force such shows encouraged and celebrated.

---

[6] See https://www.youtube.com/watch?v=A_l8Xwp_Q54

17

97.     On information and belief, Sheriff Del Bosque's television series was well-known to members of the County Commissioner's Court and other Zapata County leadership.

98.     At the same time "La Ley de Zapata" was instilling a culture of excessive force into deputies, Sheriff Del Bosque created a new motto for his troops: "Fierro!"  A former deputy described the motto as meaning "we are iron, bring it on!" or "you want fierro, you're going to get fierro!"  Police promising violence is what one might expect from brutal law enforcement regimes in the Third World—like the "fire for fire" embossed on Nigerian squad cars—but is vastly different than the "to protect and serve" motto that most Americans associate with police.

### Inadequate training, supervision, and discipline

99.      Former Sheriff's Office personnel report that since Sheriff Del Bosque took office in 2020, deputies have received little to no training in (1) conducting warrantless seizures or (2) use of excessive force, including de-escalation techniques or proper takedown procedures.  According to these sources, there is no formal, or even informal, training program or requirements of any kind in Zapata County beyond what might have been undertaken pre-employment while getting a peace-officer commission.

100.    Determining the Sheriff's level-of-concern (or deliberate indifference) towards warrantless seizures and/or proper use of force is possible in this case by following the money.  According to the County Budgets from FY 2020-21 to FY 2022-23, the Zapata County Sheriff's Office had earmarked only $5,000 each year for the education and training of all personnel despite the total budget growing from $2 million to nearly $4 million over this period.[7]

---

[7] This does not include separate budgets the Sheriff's Office maintains for jail and juvenile detention operations.

101.   In other words, the level-of-concern that Sheriff Del Bosque and the County placed on the proper training of sheriff deputies, generally, **shrank in half** from 0.25% of operational costs to only 0.125% over this period.  Another way of stating this is that Sheriff Del Bosque was 99.875% indifferent to training his deputies. Moreover, discovery will almost certainly show that within this paltry $5,000 budgetary line-item, the amount spent specifically on warrantless seizures and use of force training was either nothing or next-to-nothing.

102.   Mr. Barrientos can aver this with confidence because former Sheriff's Office personnel contend and suspect that a significant portion of the $5,000 training and education budget was spent by Sheriff Del Bosque to finance his own trips to law enforcement conferences and events.

103.   Is it fair to say that a Sheriff who was more than 99.875% indifferent to providing training resources was, in fact, "deliberately" indifferent to his deputies understanding how and when to use force and their custodial powers on the community they police?  A jury might reasonably find so.  At the very least, these numbers show that Sheriff Del Bosque's level-of-concern for citizen safety and rights during police encounters started small and plummeted downward from there.

### Failure to Discipline and Ratification

104.   Sheriff Del Bosque compounded the absence of training by refusing to discipline deputies who made wrongful arrests/detentions or used excessive force.  This was an unwritten but well-known and reliable policy that every deputy understood.

105.   To say there are procedural and functional inadequacies within Sheriff Del Bosque's disciplinary system itself would be an understatement.  There is no formal disciplinary system, as one expects to find out sheriff's offices the size of Zapata County's.

106.   There is no functional internal affairs division or disciplinary agency in the Zapata County Sheriff's Office, and citizen complaints "go nowhere" according to a former deputy.

19

107.    There are no formal standards of review.  Officers are not required to submit formal statements in response to complaints or sit for questioning before a review panel.  Officers are not even required to submit cursory reports or subjected to cursory questioning.  There is no skeptical cross-examination of accused officers.  In other words, according to one former deputy, Sheriff Del Bosque doesn't even pretend to care.

108.    There is no civilian review board or civilian participation at all in officer disciplinary review or conduct complaints.  The Sheriff controls everything.

109.    Deputy discipline goes through the Sheriff and is meted out on an ad hoc basis.

110.    On information and belief, there was no formal disciplinary review conducted after the Barrientos tragedy.  There was no disciplinary action taken against any officer involved.

111.    To the contrary, at least one of the deputies was rewarded for his actions.  Sheriff Del Bosque first promoted defendant Deputy Martinez into a higher paying, more prestigious federally funded position within his police force *after* he crippled and almost killed Mr. Barrientos.

112.    It is plausible that Sheriff Del Bosque knew enough detail about what happened to Mr. Barrientos from visiting with one or more of the deputies involved to understand that Mr. Barrientos was falsely arrested or detained and a victim of excessive force.  Sheriff Del Bosque likewise would have understood from such briefings that Deputy Martinez had submitted a false incident report in an attempt to cover up police wrongdoing.[8]

113.    Discovery will reveal whether Sheriff Del Bosque simply ratified the false report or actually coached Deputy Martinez in what to write—either way, what is clear is that the police

---

[8] Sheriff Del Bosque was also aware that the Texas Ranger assigned to Zapata County investigated Deputy Martinez for falsifying his arrest report in another excessive force case against Zapata resident Baldomero Flores and had found enough evidence to refer the matter to the FBI.  That alone should have triggered a genuine review of Mr. Barrientos' case, had there been a good faith intent on the Sheriff's part to supervise his staff.

version of events underwent a sea change from the truthful excited utterances and present sense impressions of deputies amongst themselves and to EMS workers to what was cooked up in that report.

114. In any event, Sheriff Del Bosque next recommended Deputy Martinez for onward and upward employment with U.S. Customs and Immigration Services, where Martinez works today. Again, discovery will reveal whether the Sheriff omitted details about this particular deputy's history of brutality and dishonesty from any USCIS recommendation letters, but that too seems plausible.

115. As was the case with Deputy Martinez, Sheriff Del Bosque has also promoted another deputy guilty of an excessive force takedown in the Jason Longoria case, which was bulleted earlier.

116. On information and belief, Sheriff Del Bosque has yet to fire, demote, punish, or reprimand any deputy for an excessive force takedown or false arrest in any case since becoming sheriff.

117. The Sheriff also enforces a "code of silence" among deputies that both encourages the culture and practices of excessive force and false arrest. The code of silence reinforces his failure to discipline. As outlined more fully in the seconded amended complaint filed in *David Moya v. Zapata County of Texas, et al,* C.A. No. 5:22-CV-00117 (S.D.T.X. Laredo Division), an audiotape is in the possession of undersigned counsel wherein the Sheriff and his second-in-command threaten the entire department with termination and career-ending smear campaigns should they break this code of silence and report wrongdoing by fellow officers. They specifically hold up the example of former sheriff deputy David Moya as a cautionary example of what is in store for deputies who refuse to honor this invidious code.

21

118.    The Sheriff's promotion of or acquiescence to the use of excessive force, false arrest, and the departmental code of silence has caused a culture of impunity and violence among deputies so entrenched that they routinely bragged about their brutal exploits and exhibited body camera videos of the same to customers and female waitstaff at local restaurants.  Waitresses at one former cop-hangout in particular, Zuri's restaurant, were a frequent audience for these deputies and their abusive and assaultive videotaped exploits.

119.    These were human trophy videos.  There had been believable accounts that a human trophy video of Mr. Barrientos' horrific assault was posted in an Internet "chat-room," possibly by one of the deputy defendants in this case (who else would have had access?).  Back in June, a local FBI agent told undersigned counsel he possessed a copy, for instance.  On or about July 14, 2023, the human trophy video of Mr. Barrientos was posted on a citizen journalist's YouTube news channel, verifying its existence.

120.    Mr. Barrientos has in his possession screenshots of two young Zapata County sheriff deputies—Javier Garcia and Robert VanNest—posting laughing-face emojis in the comments after watching the horrific video.  This is the culture Sheriff Del Bosque created and condones:



121.    The entire Zapata community deserve so much better than this.

## TRIAL BY JURY

122.    Plaintiff is entitled to and hereby demands a trial by jury.  U.S. Const. amend. VII; Fed. R. Civ. P. 38.

## CAUSES OF ACTION

## COUNT ONE:

Fourth Amendment claims for (I) False Arrest and (II) Excessive Force.
(42 U.S.C. § 1983)

123.    Mr. Barrientos incorporates and re-alleges the above allegations in full.

124.    Mr. Barrientos brings these Count One claims under the United States Constitution against the four defendant deputies in their individual capacities.

125.    The Fourth Amendment of the U.S. Constitution protects citizens against unreasonable seizure by law enforcement officers.

## I.    Mr. Barrientos was falsely arrested or detained.

126.    It was clearly established at the time of Mr. Barrientos' arrest that the Fourth Amendment prohibited arrest without probable cause or detention without reasonable suspicion.  As such, Mr. Barrientos is suing Defendants for false arrest or detention.

127.    The deputies wrongfully arrested or detained Mr. Barrientos. The lack of probable cause or reasonable suspicion to arrest or detain Mr. Barrientos would have been evident to any reasonable person based on the facts and circumstances within these defendants' knowledge at the time. The deputies did not witness Mr. Barrientos break any law, nor did they have any reason to believe that he had broken any law.

128. To the contrary, the deputies had concluded their investigation, determined no probable cause or reasonable suspicion of a crime existed, and told Mr. Barrientos that he was not under arrest and could go spend the night somewhere else.

129. Prior to his arrest, Mr. Barrientos was neither given any orders or commands by police, nor did he disobey any.

130. At no time did Mr. Barrientos attempt to flee. He actually stood in the same spot for the entire encounter.

131. Mr. Barrientos issued no threats and never acted erratically.

132. The deputies were not fearful of Mr. Barrientos or concerned for their own safety because they did not put Barrientos in handcuffs or place him in the back of a squad car during his initial investigatory detention.

133. The deputies did not believe, nor would any reasonable officer believe, that Mr. Barrientos was challenging any of them to a fight or otherwise threatening anyone.

134. The videotape evidence is conclusive that Mr. Barrientos did not "square up" with Deputy Martinez or any other deputy during the entirety of their encounter, and in particular in the seconds leading up to the arrest. Mr. Barrientos did not step toward Deputy Martinez, stick his chest out, raise his hands, or make any type of dominating or threatening gesture. He made his remark about being the "hombre" or man of the house in the exact same casual manner he'd used with officers the entire time.

135. Aside from the false accusation that Mr. Barrientos "squared up" when delivering an otherwise non-threatening remark, the arrest report in this case contains no other explanation for

the arrest.[9]  As explored in Count Two below, the First Amendment protected Mr. Barrientos from arrest or detention for expressing a simple viewpoint to police officers—that he did so in a measured and non-pejorative way may make his assault by the deputies more egregious, but even that was not a First Amendment requirement.  *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) ("We apply the principle that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); see also *Wood v. Eubanks,* 25 F.4th 414 (6th Cir. 2022) (holding that coarse or profane language and epithets directed at police are not "fighting words" that justify an arrest).

136.    By arresting/detaining him without probable cause or reasonable suspicion, the deputy defendants violated Mr. Barrientos' clearly established Fourth Amendment rights.  Because Defendants lacked the legal basis to arrest or detain Mr. Barrientos, ***any*** use of force was inherently excessive and supports the damages sought in this case.

## II.    In the alternative, deputies used excessive force on Mr. Barrientos.

137.    Even if *arguendo* it was proper to arrest or detain Mr. Barrientos (it was not), the violent takedown that occurred was an excessive use of force in this case.

138.    Texas statutory law states, "No greater force … shall be resorted to than is necessary to secure the arrest and detention of the accused." Tex. Code Crim. P. art. 15.24; Id. at art. 14.05.

139.    Likewise, Fifth Circuit case law is sufficiently clear to warn a reasonable officer that the use of substantial force against a non-threatening purported misdemeanant who is not fleeing,

---

[9] The arrest report states in conclusion that after Mr. Barrientos departed by ambulance, Deputy Martinez "then proceeded to gather the information to present" a misdemeanor charge of "Assault by Threat" but, of course, that *ex post facto* information gathering (1) played no part in the arrest and (2) apparently was not presented as a charge or acted upon.  The only official offense denominated in the report was "Resisting Arrest" which, again, cannot be the basis for an arrest in and of itself.  Ultimately, Barrientos was never charged with "Resisting Arrest" or any other offense.

fighting police, or posing any risk to the safety of others violates the right to be free from excessive force, even if the individual disobeys an officer's commands. *Westfall v. Luna*, 903 F.3d 534, 549 (5th Cir. 2018) (reversing a finding of qualified immunity under similar facts even when the arrestee disobeyed an order not to follow her son into their home). In the Fifth Circuit, it is "clearly established that the permissible degree of force depends on applying the *Graham* factors." *Westfall*, 903 F.3d at 549. In determining whether the use of force in a given situation was "reasonable," courts must consider "all of the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989).

140. Other factors to be weighed in this "reasonableness" balance are whether the arrest "involved 'measured and ascending responses' to a [suspect's] noncompliance" and the "seriousness of the alleged injuries." *Buehler v. Dear*, 27 F.4th 969, 982-84 (5th Cir. 2022).

141. There was no measured or ascending response to any alleged non-compliance in this case. Mr. Barrientos was not fleeing or attempting to escape. He wasn't fighting—in fact he pleaded in Spanish with the deputies "calmate" (take it easy). At all times, Mr. Barrientos was in the grasp and control of four large male deputies. The video shows that he had both hands behind his back on multiple occasions and had the deputies taken a second to stop yanking Barrientos' arms individually to coordinate his handcuffing, the takedown could have been avoided altogether. But perhaps that wasn't the point, after all the takedown could have easily taken place in the yard, just a few feet away, but happened over hard concrete instead.

142. Second, the seriousness of Mr. Barrientos' injury shocks the conscious. A court would not be amiss in applying a "use of deadly force" analysis to this case, quite frankly. These four deputies

nearly killed an unarmed man, and crippled him for life, for what was at most a Class C misdemeanor offense. There is no possible interpretation of the facts of this case that suggest the imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery was nigh and, thus, justifying four powerful male deputies propelling Mr. Barrientos head-first into a concrete slab with enough force to snap his leg off in the process. See Tex. Penal Code § 9.32 (actions justifying use of deadly force).

143. Therefore, any reasonable police officer would have known that arresting or detaining Mr. Barrientos under these circumstances would violate his clearly established constitutional rights, as detailed above.

144. Defendants are not entitled to qualified immunity for their conduct, because their false arrest or detention of Mr. Barrientos and use of excessive force violated his clearly established constitutional rights and was objectively unreasonable, as detailed above.

145. As a direct and proximate result of this false arrest or detention and excessive use of force, Mr. Barrientos suffered actual physical, emotional, and economic harm.

146. Mr. Barrientos is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

147. Under Count One, Mr. Barrientos is also entitled to punitive damages against each Defendant under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless or wanton disregard of Mr. Barrientos' constitutional rights.

## COUNT TWO:

First Amendment retaliation claim
(42 U.S.C. § 1983)

148. Mr. Barrientos incorporates and re-alleges the above allegations in full.

149.     Mr. Barrientos brings this Count Two claim under the United States Constitution against the four defendant deputies in their individual capacities.

150.     The First Amendment of the U.S. Constitution protects citizens against retaliation from government officials for exercising their rights of free speech.

151.     Pursuant to *Keenan v. Tejeda,* 290 F.3d 252, 258 (5th Cir. 2002), Mr. Barrientos pleads that he was engaged in constitutionally protected activity.  He was simply sharing his viewpoint about gender roles and expectations to a government official in a non-threatening manner, using a normal tone of voice, without pejoratives or epithets.

152.     The deputies' actions in violently arresting and assaulting Mr. Barrientos caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. *Keenan,* 290 F.3d at 258.  Mr. Barrientos almost died, lost a leg, spent a month in the hospital, and now lives in physical and financial misery, which would chill anyone's willingness to share their viewpoints on gender, or anything else, with law enforcement or any powerful government official.

153.     The deputies' adverse actions were substantially motivated against Mr. Barrientos' exercise of constitutionally protected conduct as opposed to Mr. Barrientos' actions.  *Keenan,* 290 F.3d at 258.[10]  To recap, **two minutes earlier** the deputies had determined no underlying crime justified arresting or further detaining Mr. Barrientos.  Prior to his arrest, deputies had not given Barrientos any order; thus, no orders were disobeyed.  For instance, deputies never told Mr. Barrientos to either get in a squad car for a ride to another location or spend the night in jail.  Finally, the arrest report itself admitted that Barrientos was arrested **for the content of what he said**, despite its

---

[10] Where two explanations for the arrest exist, one being a merely plausible *action* by the arrestee, and the other being clearly protected *speech,* then the reason for arrest becomes "a question of fact for the jury." *Enlow v. Tishomingo County*, 962 F.2d 501, 510 (5th Cir. 1992).

demonstrably false description of him "squaring up" while he said it. The substantial motivation for Mr. Barrientos' arrest was, therefore, Deputy Martinez's disagreement with Barrientos' viewpoint.

154. During the pertinent conversation, the other deputy defendants had gathered next to Mr. Barrientos in easy listening range. Yet, none intervened to question or stop the unlawful arrest. Instead they all helped execute it, including the violent takedown.

155. It has been long-established "that government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable." *Keenan,* 290 F.3d at 261 (citation omitted); see also *Hartman v. Moore,* 547 U.S. 250, 256 (2006) ("Official reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise of the protected right.").

156. It is clearly established that state actors cannot punish speakers on the basis of viewpoint— the "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers" and other officials. *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008). A reasonable police officer would have understood that he could not retaliate against Barrientos because he disagreed with the content or viewpoints that he expressed. As the Supreme Court has consistently made clear, viewpoint-based discrimination of expressive activity is "egregious form of content discrimination," and is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 828-29 (1995).

157. The deputy defendants knowingly and willfully harassed, intimidated, injured, and arrested Mr. Barrientos with a reckless and callous disregard for, and deliberate indifference to, his First Amendment rights.

158.    As a direct and proximate cause of the deputies' unlawful acts, as alleged herein, Mr. Barrientos has been deprived of his rights under the First Amendment to the United States Constitution, and suffered severe physical injuries, mental anguish, wrongful arrest, legal and other costs, and fear of further retaliation from these defendants and the Zapata County Sheriff's Department.

159.    Mr. Barrientos is entitled to actual, compensatory, and punitive damages against these defendants under 42 U.S.C. §1983 in an amount to be proven at trial.

### COUNT THREE

Civil conspiracy to violate the First and Fourth Amendments
(42 U.S.C. § 1983)

160.    Plaintiff fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

161.    All or some of the deputy defendants conspired with the intent to deprive Mr. Barrientos of his constitutionally protected rights under the First and Fourth Amendments.[11]

162.    The defendant deputies' relevant acts, as alleged herein, were undertaken under the color of law and constitute state action.

163.    All or some of the deputy defendants agreed and conspired to arrest/detain, intimidate, and injure Mr. Barrientos with the intent of retaliating against him for exercising clearly established First Amendment rights, and to deprive him of the same, including the right to express viewpoints not shared by police.

---

[11] Neither Zapata County or Sheriff Del Bosque are being sued for civil conspiracy and, therefore, need not include further argument to that effect in any subsequent motion to dismiss it chooses to file.

164.    As detailed earlier, each of the deputy defendants did in fact engage in an act in furtherance of the deprivation of Mr. Barrientos' First Amendment rights, including the clearly established rights detailed herein. On information and belief, the deputy defendants acted pursuant to an express or tacit agreement intended to deprive Barrientos of those rights.

165.    As also detailed herein, the deputy defendants knowingly conspired to cause the unjustified and violent arrest or detention of Mr. Barrientos with the intent to deprive his right to be free from arbitrary seizure and the use of excessive force by law enforcement under the Fourth Amendment.

166.    No reasonable official would have so unlawfully, willingly, recklessly and/or arbitrarily conspired to deprive Barrientos of his constitutional rights.

167.    As a direct and proximate cause of the deputy defendants' unlawful acts, as alleged herein, Mr. Barrientos has been deprived of his constitutional rights and suffered damages including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

168.    Plaintiff is entitled to actual, compensatory, and punitive damages against the deputy defendants under 42 U.S.C. § 1983 in an amount to be proven at trial.


**COUNT FOUR**

Monell Claim Against Zapata County
(42 U.S.C. § 1983)


169.    Plaintiff fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

170.    Plaintiff alleges that Defendant Zapata County is liable for the Fourth Amendment violations raised in this Amended Complaint under *Monell*. To be clear, Plaintiff does not seek to hold the County liable under *Monell* for his First Amendment claims.

171.    Plaintiff also does not claim that his Fourth Amendment injuries were directly caused by an official policy written into some Sheriff's Office document that was adopted by the County Commissioner's Court or other formal proceeding.

172.    Instead, Plaintiff alleges that liability exists under *Monell* for these reasons:

    a)  There was a Custom or Policy Permitting Excessive Use of Force.

    b)  There was a Failure to Train or Supervise on Excessive Use of Force.

    c)  There was a Failure to Train or Supervise on Wrongful Arrests and Detentions.

    d)  There was a Code of Silence Around Excessive Use of Force and Wrongful Arrests and Detentions.

    e)  There was a Single-Act Decision by a Final Policymaker for the County (the Sheriff) to ***Ratify*** Excessive Use of Force in this Case.

    f)  There was a Single-Act Decision by a Final Policymaker for the County (the Sheriff) to ***Ratify*** the Wrongful Arrest or Detention in this Case.


173.    **Custom or Policy Permitting Excessive Use of Force.**  An official policy may also be an unwritten but "widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Alvarez v. City   of Brownsville,* 904 F.3d 382, 390 (5th Cir. 2018).  Plaintiff has alleged facts establishing that the ratio of excessive force cases to the population of Zapata County, Texas, far exceeds any known numerical threshold needed to sustain

a jury finding that it was and is a "widespread practice" that the Sheriff knew or should have known existed.

174.    **Custom or Policy of Failing to Train and Supervise.**    Regarding the "Failure to Train," Plaintiff has alleged facts establishing (1) that the Sheriff's training procedures were woefully inadequate, (2) that the Sheriff was deliberately indifferent in adopting his training policy, and (3) that the inadequate training policy directly caused the violations in question.  *See Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005).  These systemic failures were the moving force behind both the wrongful arrest or detention of Mr. Barrientos and the use of excessive force upon him.

175.    Sheriff Del Bosque's training procedures were not just inadequate, they were nonexistent. There are no training procedures within the Sheriff's Office.  There was $5,000 annually set aside for ad hoc training opportunities but no requirement that deputies participate in any.  Of that paltry sum, the Sheriff and leadership, on information and belief, used a significant amount of the money on themselves.   There are no allegations or any known instance of Zapata County deputies receiving arrest/detention or use of force training once on the job (and without discovery, Plaintiff is no position to comment on the existence of such training pre-employment either).

176.    Sheriff Del Bosque was deliberately indifferent to training.  Despite a large and growing operational budget, there has not been a formal police training program since the Sheriff took office in 2020.  As for ad hoc training, less than 0.125% of the Sheriff's budget supported such training. There is no evidence or allegations that any deputy received arrest/detention or use of force training.   Furthermore, citizens being injured through the use of excessive force is a "highly predictable consequence of a failure to train" deputies on the use of excessive force—seriously, the entire point of training deputies on how to use force is to keep people from getting hurt.  *Robles*

*v. Ciarletta*, 797 F.App'x 821, 833-34 (5th Cir. 2019). As such, Plaintiff has plausibly established here that the Sheriff's failure to train was due to his deliberate indifference.

177. For the same reasons, Sheriff Del Bosque needed to train his deputies on performing warrantless arrests and detentions. The need to train officers in the constitutional limitations regarding such warrantless seizures was so obvious that failure to do so amounts to deliberate indifference. Sheriff Del Bosque knew that his officers would be required to perform warrantless seizures on a routine basis in the ordinary course of police work and, if not trained properly, the predictable result would be the very constitutional violation that happened to Mr. Barrientos. This has been clearly established law in America since *City of Canton v. Harris,* 489 U.S. 378 (1989) and *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997).

178. Sheriff Del Bosque's inadequate training directly caused Plaintiff's injuries. It seems inarguable that properly trained deputies would not have taken Mr. Barrientos into custody, much less snapped the leg off of a man's body during a takedown, especially in a non-exigent, nonviolent arrest situation where the arrestee wasn't fleeing or fighting back. There are millions of misdemeanor arrests all over America each year that occur without arms or legs being ripped from people's bodies. Even a little training on proper warrantless seizures or use of force would have prevented this tragedy.

179. As for the Sheriff's "Failure to Supervise," the complaint here is premised on the lack of disciplinary action against officers who wrongfully arrest/detain citizens, employ excessive force, and/or falsify police reports to coverup such wrongdoing. As alleged, Sheriff Del Bosque's disciplinary process, both formal and informal, is woefully inadequate, with the result being that the department fails to discipline officers, as a matter of policy and practice, in the great majority (or all) of the meritorious police abuse cases that are brought to its attention.

180. The Sheriff's general failure to discipline was a direct cause of the wrongdoing and brutality that is the subject of Plaintiff's case because the defendant deputies were aware that they were effectively immunized from disciplinary action by the lack of disciplinary policy. This made the eventuality of the unconstitutional violation sufficiently obvious to the County to sustain liability under *Canton* and *Brown*.[12]

181. **Code of Silence.** Regarding the "Code of Silence," the policy and practice of failure to discipline officers for lying on police reports operated hand in hand with Sheriff Del Bosque's "code of silence." This code of silence further aided the offending officers in escaping disciplinary reproach to date and made the eventuality of wrongful arrests and excessive force injuries to Plaintiff and others sufficiently obvious to the Sheriff and County to sustain liability.

182. **Single-Act Decision by a Final Policymaker for the County (the Sheriff).** Irrespective of whether a wide-spread custom of tolerating excessive force or wrongful arrests/detentions may be shown, Plaintiff has alleged facts establishing that—for at least this specific incident—Sheriff Del Bosque ratified both the wrongdoing alleged and the deputies' attempt to conceal it through the use of a false police report.

183. Mr. Barrientos has specifically alleged facts showing that "following this incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error" by Sheriff Del Bosque or the County. *Grandstaff v. City of Borger, Tex.,* 767 F.2d 161, 171 (5th Cir. 1985). Mr. Barrientos pled that "no changes had been made in their policies." *Id.* Accordingly, a jury is "entitled to conclude that it was accepted as the way things are done and have been done" in Zapata County. *Id.*

---

[12] See *City of Canton v. Harris,* 489 U.S. 378 (1989) and *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997).

184.     As such, what occurred here was an "extreme factual situation" inasmuch as it included multiple and "obvious violation[s] of clearly established law." *Young v. Bd. of Supervisors of Humphreys Cnty., Mississippi,* 927 F.3d 898, 903 (5th Cir. 2019); *World Wide St. Preachers Fellowship v. Town of Columbia,* 591 F.3d 747, 755 (5th Cir. 2009).   Thus, there should be no defense of qualified immunity for the conduct complained of in this case.

185.     **Final Policymaking Authority.**  The County's official policy is reflected in the deliberate acts and decisions of Defendant Raymundo Del Bosque, who as county sheriff at all relevant times was the official final policymaker for Zapata County with respect to law enforcement matters, including proper arrests and use of force by deputy sheriffs.   Sheriff Del Bosque was also the official final policymaker for Zapata County in establishing training, supervision, and discipline of Sheriff's Office employees.

186.     The unconstitutional official Zapata County policies as alleged herein, were developed, ratified, and enforced, and continue to be enforced, under the color of law.

187.     The official county policies were developed, ratified, enforced, and continue to be enforced through and by officials vested with final policymaking authority either by law or delegation, including at least Raymundo Del Bosque the Zapata County Sheriff.

188.     Defendant Zapata County's acts taken pursuant to official county policy, as alleged herein, were impermissible state action that deprived Barrientos of his constitutional rights.

189.     At all times relevant to the allegations herein, Defendant Zapata County and its policymakers knew or should have known that the official policies as alleged were unlawful. Barrientos' constitutional rights were clearly established and known to the County.

190.  No local government or reasonable official with final policy-making authority would so unlawfully, willingly, and arbitrarily have developed, ratified, and enforced the unconstitutional official county policy and/or longstanding custom alleged herein.

191.  The County's official policies were the moving force behind the deprivation of Barrientos' constitutional rights as alleged herein, as they contributed to and caused the wrongful arrest of Barrientos and use of excessive force against him in violation of the Fourth Amendment.

192.  As a direct and proximate cause of Zapata County's unconstitutional official policy, Barrientos was deprived of his rights guaranteed by the Fourth Amendment of the Constitution of the United States, and has suffered damages including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

193.  As a result, Plaintiff is entitled to actual and compensatory damages against Defendant Zapata County under 42 U.S.C. § 1983, in an amount to be proven at trial.

## COUNT FIVE

Supervisory Liability under Fourth Amendment
Failure to Train, Supervise, and Discipline
(42 U.S.C. § 1983)

194.  Plaintiff fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

195.  This claim is against Defendant Del Bosque in his individual capacity only, but otherwise parallels the allegations contained within Count Four of this Complaint.

196.  Sheriff Del Bosque, at all times relevant, had supervisory duties over all Zapata County Sheriff's Department officers and other employees.

197.  At all relevant times, Sheriff Del Bosque was responsible for training, supervising, and employing individuals within his department.

38

198.    Sheriff Del Bosque, with actual or constructive knowledge, approved and ratified a pattern of overly aggressive, overly violent arrestee takedowns by department personnel, including the deputy defendants in this case.

199.    These incidents and pattern of excessive force takedowns are a result of and caused by the Sheriff's failure to train his officers and staff regarding the clearly established Fourth Amendment rights of citizens, including (1) the right to be free from unlawful seizure and arrest; (2) and the right to be free from the excessive use of force.

200.    These incidents and pattern of excessive force takedowns are a result of the culture of violent policing, highlighted by the number of other similar cases, the promotion of violence-prone deputies, like Deputy Martinez, the refusal to re-train or correct officers that used excessive force takedowns, and the toxic *esprit de corps* that led deputies to show off videos of their violent actions to the community at large.

201.    Sheriff Del Bosque was deliberately indifferent to the Fourth Amendment rights of Mr. Barrientos. For example, the Sheriff had actual or constructive knowledge that his deputies wrongfully arrested or detained Mr. Barrientos and then attempted to cover-up their wrongdoing with a false police report. Furthermore, the Sheriff had actual or constructive knowledge of the excessive force takedown incidents detailed in Plaintiff's Factual Allegations but took no action to remedy his officers' deprivation of Barrientos' constitutional rights or train his officers to prevent similar incidents in the future.

202.    Sheriff Del Bosque acted with malice and/or deliberate indifference to Barrientos' rights and acted at all times under color of law in undertaking the supervisory acts and omissions detailed herein.

203.    At all times relevant to the allegations herein, Defendant Del Bosque knew or should have known that the acts of his subordinates, which he knowingly supervised and approved, were unconstitutional.  (1) It is clearly established that an official cannot restrict, interfere with, or punish speech based on the viewpoint expressed.  (2) It is clearly established that an arrest must be based on probable cause and a detention must be based on reasonable suspicion.  (3) It is clearly established that severing the leg of a non-violent, non-fleeing misdemeanant during arrest is excessive force.

204.    No reasonable official with supervisory duties would so have knowingly directed, authorized, participated in, and/or approved the deprivation of Mr. Barrientos' constitutional rights in the same manner as the Sheriff did.

205.    As a direct and proximate cause of Sheriff Del Bosque's unlawful supervisory acts and omissions, as alleged herein, Mr. Barrientos has been deprived of his constitutional rights and suffered damages including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

206.    Plaintiff is entitled to actual, compensatory, and punitive damages against Sheriff Del Bosque under 42 U.S.C. § 1983 in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of the Defendants, and award the following relief:

A.    Declaration that Defendants' conduct violated the First and Fourth Amendments of the United States Constitution;

B.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

C.      Compensation for economic losses on all claims allowed by law in an amount to be proven at trial;

D.      Punitive damages on all claims allowed by law in an amount to be determined at trial;

E.      Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

F.      Pre- and post-judgment interest at the lawful rate; and

G.      Any other relief that the Court deems just and proper.

Dated this 7th day of November 2023.

Respectfully submitted,

By: s/Kevin D. Green_____
Kevin D. Green
*Attorney-in-Charge*
Texas Bar No.: 00792544
S.D. Tex. I.D. No.: 3737219
**LAW OFFICE OF KEVIN D. GREEN**
7960 Mesa Trails Cir
Austin, TX 78731
Telephone: (512) 695-3613
kevin@consumerjusticecenter.com

Thomas J. Lyons, Jr., Esq.
Attorney  I.D. #249646
**CONSUMER JUSTICE CENTER, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone: (651) 770-9707
Facsimile: (651) 704-0907
tommy@consumerjusticecenter.com

*ATTORNEYS FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

On November 7, 2023, I filed the foregoing document with the clerk of the court for the

U.S. District Court, Southern District of Texas.  I hereby certify that I have served the document

41

on all counsel or parties of record in a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

<u>s/Kevin D. Green</u>