United States District Court
Southern District of Texas
**ENTERED**
September 30, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | | |
|---|---|---|
| **RIGOBERTO BARRIENTOS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 5:23-CV-00068** |
| | § | |
| **JOSE MARTINEZ, *et al.*,** | § | |
| **Defendants.** | § | |

**ORDER**

Before the Court is Defendant José Martinez's Motion for Summary Judgment, (Dkt. No. 82), Defendants Ariel Gonzalez, Jose Ramirez, and Hector Solis's Motion for Summary Judgment, (Dkt. No. 83), Plaintiff Rigoberto Barrientos's Partial Motion for Summary Judgment, (Dkt. No. 58), and Defendants' Opposed Motion to Exclude or Limit Opinions of Christopher Darcy, (Dkt. No. 73). Barrientos brings claims under 42 U.S.C. § 1983 against Defendants Zapata County Sheriff's Deputies José Martinez, Ariel Gonzalez, José Ramirez, and Hector Solis, alleging, *inter alia*, that the defendant deputies wrongfully arrested him and used excessive force in violation of the Fourth Amendment. Further, Barrientos claims that Defendants retaliated against him for exercising his First Amendment rights. Defendants move for summary judgment on all remaining claims.[1] For the reasons explained below, Defendants' motions for summary judgment will be granted in full.

## I. BACKGROUND

### A. Factual Background

In the early hours of April 26, 2022, Plaintiff Rigoberto Barrientos arrived at the home of his girlfriend, Gloria Alaniz, after he finished working for the day. (Dkt. No. 91-1 at 62).[2] The two of them lived at Ms. Alaniz's home. (*Id.*). In the course of the evening,

[1] Barrientos also brought claims against Zapata County and Sheriff Raymundo Del Bosque. (Dkt. No. 21). However, those claims were previously dismissed by the Court. (Dkt. No. 34 at 42).

[2] Barrientos has alleged that the arrest occurred on February 26, 2022. (Dkt. No. 21 at 7). However, the time stamps on the police body camera footage reveals the date was April 26, 2022. (Dkt. No. 79-5). The Court proceeds under the assumption that the date in the complaint is incorrect and will refer to the arrest as occurring on April 26, 2022, based on the summary judgment evidence, although the date of the incident is not relevant to the Court's analysis. When citing to the page numbers of any document in the record, the

they drank alcohol and ingested cocaine, with Barrientos drinking approximately seven beers and ingesting cocaine three times that night. (*Id.* at 64–65).

Alaniz called the police after an argument broke out between the two of them. (*Id.* at 66). Deputy Jose Martinez was the first deputy on the scene, arriving at 3:15 a.m. (Dkt. No. 79-5-1 at 03:15:40).[3] His interactions with Barrientos and Alaniz were recorded on his body camera. (Dkt. No. 79-5-1). He spoke briefly with Barrientos on the porch when he arrived. (*Id.* at 03:15:40–03:18:20). Deputy Martinez learned from his conversation with Barrientos that he and Alaniz had been drinking alcohol. (*Id.*; Dkt. No. 79-6 at 4). Barrientos also told Deputy Martinez he had been "locked up" for several years and had been dating Alaniz for four to five months. (Dkt. No. 79-5-1 at 03:18:00–03:18:20; Dkt. No. 79-6 at 8–9).[4] Barrientos denied that he was violent toward Alaniz, stating in Spanish, "I do not touch women. [sic]". (Dkt. No. 79-5-1 at 03:18:17; Dkt. No. 79-6 at 8). Deputy Martinez then entered the house to speak with Alaniz as other deputies arrived on the scene. (Dkt. No. 79-5-1 at 03:18:30). The following transcription and translation reflect the conversation between Alaniz and Deputy Martinez:

Court will cite to the page numbering of the Court's internal CM/ECF docket system, and not to the page numbers in the underlying documents.

[3] When citing to video exhibits in the record, the Court will cite to the time stamp in the video that reflects the actual time of the event, not the playback time. For Defendants' attached body camera videos, the Court will refer to the various videos based on the order they are listed on the filed USB drive. (Dkt. No. 79-5). Plaintiff and Defendants all refer to the body camera footage in their summary judgment briefing. "Much of the incident, including its unfortunate conclusion, was recorded by video cameras. Although courts must construe evidence in light most favorable to the nonmoving party, we will not adopt a plaintiff's characterization of the facts where unaltered video evidence contradicts that account." *Thompson v. Mercer*, 762 F.3d 433, 435 (5th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)). To the extent either party suggests any sworn statement characterizing the facts contradicts the unaltered body camera footage, the unaltered body camera footage is more persuasive.

[4] At the hearing, the parties agreed that the transcription and translation, (Dkt. No. 79-5), of the audio from the body worn camera videos accurately reflects statements made in the video. The Court accepts the transcription and translation as summary judgment evidence.

| | |
|---|---|
| **OFF. MARTINEZ:** ¿Qué 'ta pasando, madre? | What's going on, ma'am? |
| **G. ALANIS:** Eh? | Huh? |
| **OFF. MARTINEZ:** What happened or what? | What happened or what? |
| **G. ALANIS:** No, estaba muy bien, pero él se… se porta muy… muy mal conmigo cuando ya toma y todo, si estábamos tomando muy bien así. | No, everything was really fine, but he… he behaves very… very bad when he drinks and everything, we were drinking fine like this. |
| **OFF. MARTINEZ:** Sí. | Yes. |
| **G. ALANIS:** Usted mira que 'tabamos tomando muy bien. | You see that we were drinking fine. |
| **OFF. MARTINEZ:** No, y me imagino que tiene mala tomada porque ya ves, llegué yo y ¿Qué? ¿Qué? | No, and I imagine that he's a bad drunk because you see, I arrived and "What? What?". |
| **G. ALANIS:** Sí, sí, por eso te digo, no, realmente es mejor que se vaya. | Yes, yes, that's why I'm telling you, no, honestly, it's better if he leaves. |
| **OFF. MARTINEZ:** ¿No… ¿No la… ¿No la tocó? ¿No la to… | He… he… he didn't touch you? He didn't to… |
| **G. ALANIS:** Me quiso pegar, pero yo le dije: "Si me pagas… me pegas, le dije, yo le voy a hablar a la chota" le dije, por eso les hablé. | He wanted to hit me, but I told him, "If you hit me… you hit me", I told him, "I'm going to call the cops", I told him. That's why I called. |
| **OFF. MARTINEZ:** So, he didn't touch you? | So, he didn't touch you? |
| **G. ALANIS:** No. | No. |
| **OFF. MARTINEZ:** Are you sure? | Are you sure? |
| **G. ALANIS:** Yes. | Yes. |
| **OFF. MARTINEZ:** He was go… he was leading to that point? | He was go… he was leading to that point? |
| **G. ALANIS:** Me iba a pegar, pero | He was going to hit me, but |

| | |
|---|---|
| cuando yo le dije ¿Sabes qué? Le dije le voy a hablar a la chota, de volada les hablé a ustedes. | when I told him, "You know what?", I told him, "I'm going to call the cops", right away I called you all. |
| **OFF. MARTINEZ**: Did he stop right away? | Did he stop right away? |
| **G. ALANIS**: Yes. | Yes. |
| **OFF. MARTINEZ**: And what did he say? | And what did he say? |
| **G. ALANIS**: Me dijo que no, dijo ah, 'ta bueno. Es que realmente él no se quiere meter en problemas porque él 'ta en probation, ¿Me entiendes? | He told me no, he said "ah, alright". It's because in reality he doesn't want to get into any problems because he's in probation, do you understand me? |

(Dkt. No. 79-6 at 9–11).

Alaniz told Deputy Martinez that she wanted Barrientos to spend the night elsewhere and agreed to allow Barrientos to reenter the home to gather his clothes. (Dkt. No. 79-5-1 at 03:19:00–03:20:00; Dkt. No. 79-6 at 12–13*)*. Deputy Martinez went back outside to the porch at approximately 3:21 a.m. (Dkt. No. 79-5-1 at 03:21:15). Deputy Martinez asked Barrientos if he wanted to call his sister to pick him up. (Dkt. No. 79-5-1 at 03:21:15–03:21:19). Barrientos responded, in Spanish, "Either way." (*Id.* at 03:21:19–03:21:20; Dkt. No. 79-6 at 15). Deputy Martinez then told Barrientos, in English, "If you want, we can give you a ride." (Dkt. No. 79-5-1 at 03:21:15–03:21:25*)*. Barrientos responded that he did not want a ride from the deputies. (*Id.* at 03:21:22). Deputy Martinez told Barrientos that he and Alaniz needed to be separated for the night, and that Deputy Martinez and Barrientos would leave together after they got his clothes. (*Id.* at 03:21:25–03:21:35). Barrientos answered, in Spanish, "That's okay." (*Id.* at 03:21:37).

Barrientos attempted to use his cell phone to call his sister, but the phone's battery

had died. (*Id.* at 03:22:45). Deputy Ariel Gonzalez, standing to the right of Barrientos, told Barrientos, "We can give you a ride. We aren't going to take you to jail or anything." (*Id.* at 03:22:53). Barrientos responded, "I don't want to go to jail, bro." (*Id.* at 03:22:56). Deputy Gonzalez responded, "No, no, no, I am asking if you want to get a ride with us." (*Id).* Deputy Martinez interjected, "We're here to help you out, we're not here to fuck you up." (*Id.* at 03:23:12). Barrientos responded, in Spanish, "It's that you need to understand what's up, you understand? You are in my house, bro." (*Id.* at 03:23:19).

Deputy Martinez replied, "It's her house, no?" (*Id.* at 03:23:20). Barrientos responded, "It's her house, but I am the man, right?" (*Id.* at 03:23:24). Deputy Martinez asked, "What does that have to do with anything?" (*Id.* at 03:23:27). Barrientos responded, "What?" or "Huh?" (*Id.* at 03:23:29).

At that point, Deputy Martinez ordered Barrientos to put his hands behind his back. (*Id.* at 03:23:33). Deputy Martinez seized Barrientos's left arm first and put it behind his back. (Dkt. 79-5-4 at 04:23:33).[5] Barrientos immediately allowed him to do so. (*Id.*). Deputy Martinez then said to Barrientos; "I am going to take you down." (Dkt. No. 79-5-1 at 03:23:36*).* Deputy Gonzalez grabbed Barrientos by his left shoulder as Deputy Martinez removed handcuffs from his belt. (Dkt. 79-5-5 at 03:23:34). At the same time, Deputy Hector Solis placed his left hand on Barrientos's right arm. (*Id.* at 03:23:36). After handcuffs had been secured on Barrientos's left hand, Deputy Solis then placed his right hand on Barrientos's right arm, securing both of his hands around Barrientos's right arm. (*Id.* at 03:23:43). Barrientos, standing in place with his hands behind his back, immediately became tense and said to Defendants in Spanish, "Calm down" or "Take it easy." (*Id.* at 03:23:40–03:24:50*).* During the process, deputies said repeatedly "relax, relax, and stop resisting." (*Id.*).

Deputy Jose Ramirez, standing on Barrientos's left, grabbed at Barrientos's left arm. (Dkt. No. 79-5-1 at 03:23:36−41). The body camera footage shows Barrientos standing in place with his arms behind his back as the four deputies struggle with him for approximately fifteen seconds. (*Id.* at 03:23:33−03:23:48; Dkt. No. 79-5-4 at

[5] Solis's body camera footage is time-stamped one hour ahead of Deputy Martinez's. Any reference to a time stamp from Solis's body camera footage is one hour ahead of the actual time the footage was captured.

04:23:33–04:23:48; Dkt. No. 79-5-5 at 03:23:33–03:23:48).

Then, at 3:23:48 a.m., Deputy Martinez initiated a takedown maneuver by placing his own leg in front of Barrientos's left knee, to use his leg as leverage to pull Barrientos to the ground. Instead, the maneuver caused Barrientos's knee to hyperextend in the opposite direction. (*Id.* at 03:23:48). Barrientos's left knee snapped backward, with the bones in his leg tearing through the skin. (*Id.*).

After the takedown, Deputy Martinez and Ramirez placed handcuffs on Barrientos, who was lying face down on the cement patio. (Dkt. 79-5-1 at 03:23:52). Deputies Gonzalez and Solis pressed their knees into Barrientos's back and right thigh. (*Id.* at 3:24:01). Suddenly, Deputy Solis noticed blood coming from Barrientos's left leg and shouted for a tourniquet. (*Id.* at 03:24:04). Realizing the severity of Barrientos's injury, Deputy Solis shouted, "I think his bone popped out of his leg." (*Id.* at 03:24:25).

Barrientos was transported by ambulance to Laredo Medical Center and then transported to a hospital in San Antonio, Texas after he was stabilized. (Dkt. No. 79-13 at 2). Surgeons opted to amputate Barrientos's left leg to save his life. (*Id.* at 3).

**B. Procedural Background**

Barrientos's live complaint brings claims under 42 U.S.C. § 1983 against Defendants Zapata County, Texas, Sheriff Raymundo Del Bosque, and Deputies Martinez, Gonzalez, Ramirez, and Solis, alleging, *inter alia*, that the defendant deputies wrongfully arrested him, retaliated against him for exercising his First Amendment rights, and used excessive force in violation of the Fourth Amendment. (Dkt. No. 21). Further, Barrientos brought a *Monell* claim against Zapata County, alleging that Sheriff Del Bosque failed to train, supervise, or discipline his deputies regarding the use of force. (*Id.*). Finally, Barrientos brought a failure-to-train claim against Sheriff Del Bosque in his individual capacity. (*Id.*).

Defendants Zapata County and Del Bosque filed a motion to dismiss for failure to state a claim. (Dkt. Nos. 22, 23). Deputies Gonzalez, Ramirez, and Solis filed a motion to dismiss as well. (Dkt. No. 24). The Court granted in part and denied in part the motions to dismiss on March 28, 2024. (Dkt. No 34).[6] Consequently, Barrientos has three

[6] Referring to the Court's prior Order on Defendants' motions to dismiss, (Dkt. No. 34), Barrientos asserts that "[T]he Court has already evaluated the same body-worn footage at issue here and concluded

remaining Section 1983 claims against the individual deputies: (1) false arrest in violation of the Fourth Amendment; (2) First Amendment retaliation, and (3) excessive force in violation of the Fourth Amendment. (*Id.* at 2).

On October 1, 2025, Barrientos filed a Rule 56 Partial Motion for Summary Judgment. (Dkt. No. 58). Barrientos seeks determination of two legal issues relating to Count I for which there is no dispute of material fact: (1) whether there can be probable cause for assault by threat with no evidence of how the purported threat was conveyed; and (2) whether a citizen who began custody inside his own home and was asked to come out on his front porch meets the "public place" element of a public intoxication offense. (*Id.* at 4–5). On February 17, 2026, Deputy Martinez and Deputies Solis, Ramirez and Gonzalez filed separate Rule 56 Motions for Summary Judgment. (Dkt. Nos. 82, 83). Deputy Martinez advances four grounds for summary judgment: (1) there was no excessive force because the injury was accidental, it did not result "directly and only" from Deputy Martinez, and the force was not "objectively unreasonable"; (2) there is no First Amendment retaliation claim because Barrientos was not arrested for engaging in free speech and probable cause existed at the time of the arrest; (3) the arrest was lawful because there was probable cause; (4) Deputy Martinez is entitled to qualified immunity because he did not violate Barrientos's clearly established constitutional rights and his actions toward Barrientos were objectively reasonable.

Deputies Solis, Ramirez, and Gonzalez advance four similar bases for summary judgment: (1) none of the Defendants used any significant force that caused Barrientos's injury; (2) there is no First Amendment retaliation claim because Barrientos was not arrested for engaging in free speech and probable cause existed at the time of the arrest; (3) the arrest was lawful because there was probable cause; and (4) Defendants are entitled to qualified immunity.

---

that, when viewed in the light most favorable to Plaintiff, the record supports constitutional violations." Obviously, the Court applied a different legal standard applicable to Rule 12(b)(6) motions to dismiss on the pleadings, regardless of whether the body-worn video was incorporated into Plaintiff's complaint and considered by the Court. (*See* Dkt. No. 90 at 2). While the Court may take its prior ruling into consideration, it is not controlling on the issues before the Court, as was recognized in the Order. For example, the Court's prior Order noted "The Court cannot determine with certainty whether probable cause existed to arrest Plaintiff. …. A motion under Rule 12(b)(6) merely evaluates the adequacy of the allegations in a complaint rather than the merits of the case." (Dkt. No. 34 at 18).

### 1. Defendants' Objections to Plaintiff's Summary Judgment Evidence

As a preliminary matter, the Court will address Defendants' objections to some of Barrientos's summary judgment evidence. (*See* Dkt. No. 95 at 20–22). Specifically, Defendants object to Texas Department of Public Safety (DPS) Records pertaining to *Baldomero Flores v. Zapata County*, (Dkt. No. 92), and body camera video from discovery in *Baldomero Flores*, (Dkt. No. 91 at 2). The exhibits regarding *Baldomero Flores v. Zapata County* are offered by Barrientos to challenge Deputy Martinez's credibility when he stated in his deposition testimony that he has used a leg sweep maneuver numerous times "with no incident or injury." (Dkt. Nos. 79-2 at 16–17; 90 at 6).

The exhibits from *Baldomero Flores* show that a prior takedown maneuver initiated by Deputy Martinez led to the injury of Mr. Baldomero Flores. (*See* Dkt. Nos. 91, 92). Defendants object to the introduction of this evidence on the following grounds: (1) the evidence cannot be presented in an admissible form; (2) the evidence is not accompanied by an affidavit from a person competent to testify to the information at trial; (3) the evidence was not previously submitted to Defendants before the close of discovery; (4) the evidence is not relevant; and (5) credibility determinations have no place at the summary judgment stage. (Dkt. No. 95 at 20–22).

Barrientos does not respond to Deputy Martinez's objections. Therefore, the Court will accept the representation that the *Baldomero Flores* materials were not previously produced to Defendants prior to April 13, 2026, the date they were filed with the Court. "The law is very clear: evidence that was not properly produced during discovery cannot be used to support or oppose summary judgment." *Reuter v. XTO Energy, Inc.*, No. 4:20-CV-01474, 2022 WL 2712860 (S.D. Tex. July 13, 2022) (quotation omitted). Deputy Martinez's deposition was taken on May 2, 2025. (Dkt. No. 79-2). Discovery closed in this case on December 5, 2025. (Dkt. No. 54). The evidence from *Baldomero Flores* was first disclosed to Defendants on April 13, 2026, when it was filed with the Court. (Dkt. No. 90). As such, Defendants' objection to the introduction of evidence from *Baldomero Flores* is **SUSTAINED**. The Court does not consider the evidence from *Baldomero Flores* as

part of the summary judgment evidence in this case.[7]

**2. Defendants' Motion to Exclude Expert Testimony**

On February 2, 2026, Defendants filed three motions to exclude certain opinions of Barrientos's testifying experts, including a motion to exclude expert opinions of Christopher Darcy. (Dkt. No. 73).[8] Defendants seek to exclude expert opinions of Mr. Darcy, who has offered opinions relating to police conduct, probable cause, and the use of force. (*Id.*). Barrientos does not point to or identify any specific opinions or particular testimony of Mr. Darcy in opposition to Defendants' motions for summary judgment. (Dkt. No. 90). Plaintiff only points to two portions of Mr. Darcy's supplemental report: first, on the issue of probable cause for arrest; second, opining that it is more likely than not that Barrientos felt he could not leave the conversation with Deputy Martinez due to his history of incarceration. (Dkt. No. 58 at 20, 28).

Mr. Darcy is currently the CEO of Fairfax Consulting Group, LLC. (Dkt. No. 73-2 at 5). He was a commissioned police officer for the Las Vegas Metropolitan Police Department for 32 years and most recently held the position of Undersheriff, which included responsibility for overseeing the police department's daily operation and responsibility for the safety and security of the Clark County Detention Center. (*Id.*). Mr. Darcy offered opinions regarding (1) the lack of probable cause for Barrientos' arrest; (2) the opportunity to comply, the arrest, and force warnings, (3) excessive and unreasonable force, and (4) the duty to intervene. Defendants moved to exclude Darcy's opinions. (Dkt. No 73). A motion hearing was held on June 23, 2026, and the parties were ordered to confer on Defendants' motion to exclude Mr. Darcy's testimony to attempt to narrow the disputed issues. (Min. Entry June 23, 2026).

On July 3, 2026, the parties filed a joint advisory informing the Court that they had reached agreement to resolve many of Defendants' objections to Mr. Darcy's testimony. (Dkt. No. 98). Two objections to Mr. Darcy's testimony remain: (1) whether

[7] Even if the Court were to consider the information contained in the *Baldomero Flores* materials presented by Martinez, it would not change the Court's conclusion on whether the force used by Martinez was excessive or whether Martinez violated a clearly established right.

[8] The other two motions to exclude filed by Defendants challenge opinions of Dr. Stan Smith, who offers opinions relating to economic damages suffered by Barrientos, (Dkt. No. 71), and Dr. Alex Willingham, who offers opinions on Barrientos's potential future medical needs and the costs of his care, (Dkt. No. 72). Those two motions do not challenge opinions pertinent to the pending motions for summary judgment, and it is therefore not necessary for the Court to address them at this time.

Mr. Darcy may offer opinions that implicitly endorse Barrientos's version of events, reject the officers' testimony, resolve factual disputes, characterize testimony as truthful or untruthful, or otherwise invade the jury's exclusive role in determining witness credibility; and (2) whether Mr. Darcy may offer an opinion that Barrientos's physical movements, muscle tension, body positioning, or reactions during the handcuffing process were caused or created by the officers' actions. (Dkt. No. 98).

A witness may testify as an expert if the proponent demonstrates by a preponderance of the evidence that (1) the expert's scientific, technical, or other specialized knowledge will be helpful to the trier of fact, (2) the testimony is based on sufficient facts or data, (3) the testimony is based on reliable principles and methods, and (4) the expert's opinion is the result of a reliable application of those principles and methods. Fed. R. Evid. 702. Expert testimony is not admissible when the expert witness merely synthesizes a party's trial arguments and presents them as an expert opinion. *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798–99 (N.D. Tex. 2013); *Exume v. United Cargo Logistics, LLC*, No. 4:24-CV-205, 2025 WL 1688329, at *7 (E.D. Tex. June 16, 2025). Further, if the subject matter is within the jury's knowledge or experience, the expert testimony may be excluded "because it does not then meet the helpfulness criterion of Rule 702." *Lee v. Andersen*, 616 F.3d 803, 809 (8th Cir. 2010) (affirming exclusion of expert opinion that decedent was not holding firearm because "the jury was entirely capable of analyzing the images and determining whether Fong Lee had anything in his hands"); *Garcia v. Dollar Tree Stores, Inc.*, No. 13-CV-167, 2014 WL 12889031, at *2 (W.D. Tex. July 29, 2014) (excluding expert testimony about video evidence in part because expert testimony is not appropriate where "any lay person can watch the video and determine the clarity of the events depicted"); *see also Vogler v. Blackmore*, 352 F.3d 150, 155 (5th Cir. 2003) (Expert testimony may be excluded as unhelpful if it is "well within the common sense understanding of jurors and requires no expert testimony."). Such testimony by an expert witness invades the jury's role as the finder of fact.

The parties have agreed that Mr. Darcy will not offer opinions about conclusions of law. (Dkt. No. 98). And although the parties have reached an agreement to limit the scope of Mr. Darcy's opinions, they have not identified which specific portions of Mr.

Darcy's 61-page report or his deposition testimony remain in dispute, and Barrientos does not identify any portions of Mr. Darcy's opinions or testimony as summary judgment evidence in his response to the motions for summary judgment, (Dkt. No. 90).[9] A review of Mr. Darcy report and deposition testimony reveals that many of his opinions are an interpretation of the body camera footage that otherwise would be interpreted by a jury at trial. (Dkt. Nos. 73-2; 73-3; 73-4). For example, Mr. Darcy opines that, "[b]ody camera footage reveals that Mr. Barrientos was calm, cooperative, and posed no threat." (Dkt. No. 73-2 at 37). Mr. Darcy also opines that the body camera footage "indicates the officer's use of force was intended to punish or retaliate against Mr. Barrientos because they lacked the patience to warn of the consequences of not following commands." (*Id.* at 41). Although Mr. Darcy purports to base these opinions on his law enforcement experience, this type of testimony is not helpful to the jury because the jury can interpret the video based on common sense, common experience, or simple logic. *See* Wright & Miller § 6265.2

To the extent Mr. Darcy offers an opinion that Barrientos's physical movements, muscle tension, body positioning, or reactions during the handcuffing process were caused or created by the officers' actions, that testimony is excluded. Mr. Darcy's opinions on this issue are merely interpreting the body camera video evidence that a jury would be responsible for interpreting at trial. Mr. Darcy's interpretation of the body camera video would not inform the jury. Rather, it would invade the province of the jury as the finder of fact. The body camera video evidence speaks for itself. To the extent Mr. Darcy offers testimony that merely recites or summarizes Barrientos's version of the facts and Barrientos's arguments, that testimony is also excluded.

Accordingly, Defendants' Opposed Motion to Exclude or Limit Opinions of Christopher Darcy, (Dkt. No. 73), as modified by Parties' Joint Advisory Regarding Defendants' Motion to Exclude the Opinions of Christopher Darcy, (Dkt. No. 98), is

[9] "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.*; *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). The Court is under no obligation to search through Mr. Darcy's 61-page report, supplemental report, or deposition transcript for information that could plausibly create a dispute of material fact.

**GRANTED** as set forth above.[10]

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when the record establishes "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact or the appropriateness of judgment as a matter of law." *Voelter v. Daimler Trucks N. Am., LLC*, 547 F. Supp. 3d 614, 618 (W.D. Tex. 2021) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the movant meets its burden, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which th[e] evidence raises a genuine dispute of material fact." *Id.* at 619 (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law." *Id*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A genuine dispute will not be satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

When considering summary judgment evidence, the Court must view "all facts and inferences . . . in the light most favorable to the nonmoving party." *Id*. (quoting

[10] Even assuming for the sake of argument that Defendants' remaining objections to Mr. Darcy's testimony, (Dkt. No. 98), were overruled, it would not alter the Court's ultimate conclusion that Defendants are entitled to qualified immunity on all pending claims brought by Barrientos. Even if the Court were to agree with Barrientos that Mr. Darcy's testimony, together with the other summary judgment evidence, creates a genuine issue of material fact, the Defendants are entitled to qualified immunity because Barrientos has not identified any clearly established right that was violated by Defendants' actions. *Zorn v. Linton*, 607 U.S. 568, 571 (2026); *Bailey v. Ramos,* 125 F.4th 667, 684 (5th Cir. 2025).

*Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)). The Court must "not weigh the evidence or evaluate the credibility of witnesses." *Id.* (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)). The Court must "resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy [i.e.,] . . . when both parties have submitted evidence of contradictory facts." *Id.* (quoting *Little*, 37 F.3d at 1075). The Court will not assume, however, "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts, and will grant summary judgment . . . [if] critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Id.* (internal quotations omitted).

**B. Qualified Immunity**

The doctrine of qualified immunity "protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023). The Fifth Circuit Court of Appeals has further explained: "This immunity protects all but the plainly incompetent or those who knowingly violate the law. Accordingly, we do not deny immunity unless existing precedent places the constitutional question beyond debate." *Id.* (citation modified).

Qualified immunity shields government officials from 42 U.S.C. § 1983 liability unless their conduct violates a constitutional right that was clearly established at the time of the alleged misconduct. *Zorn v. Linton*, 607 U.S. 568, 571 (2026); *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Zorn*, 607 U.S. at 572 (citation modified).

"A right is not clearly established if existing precedent does not place the constitutional question beyond debate." *Id.* "To find that a right is clearly established, courts generally 'need to identify a case where an officer acting under similar circumstances ... was held to have violated' the Constitution." *Id.* (quoting *Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam)). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (quoting *District of*

*Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). Officials "receive qualified immunity unless they could have read the relevant precedent beforehand and known that it proscribed their specific conduct." *Id.*

In this context, courts apply a two-step analysis to determine whether qualified immunity applies: (1) whether the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was clearly established such that a reasonable official would have known the conduct was unlawful. *Mace*, 333 F.3d at 623–24 (citation omitted). Courts may address these prongs in any order. *Pearson*, 555 U.S. at 236.

"Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) (citation modified). "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's asserted constitutional or federal statutory right." *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (citation modified). Thus, denial of an official's motion for summary judgment predicated upon qualified immunity requires two distinct determinations: (1) "a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law"; and (2) "a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Hogan v. Cunningham*, 722 F.3d 725, 730 (5th Cir. 2013) (citation modified).

When a defendant moves for summary judgment based on qualified immunity, the defendant "must be prepared to concede the best view of the facts to the plaintiff." *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) (quoting *Gonzalez v. Dall. Cnty.*, 249 F.3d 406, 411 (5th Cir. 2001)). A qualified immunity defense alters the usual summary judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* Despite this, the court must view the evidence in the light most favorable to the nonmovant and draw all inferences in the nonmoving party's favor. *Rosado v. Deters*, 5 F.3d 119, 122–23 (5th Cir. 1993). The court

may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**C. Section 1983 Claims**

Section 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. In a Section 1983 suit, law enforcement officers may be sued in their individual and/or official capacities. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). A person may assert a Section 1983 claim against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State," violates that person's constitutional rights. 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of law. *Anderson v. Valdez*, 845 F.3d 580, 599 (5th Cir. 2016).

## III. DISCUSSION

**A. Barrientos's Section 1983 Fourth Amendment Claim for False Arrest**

Barrientos claims that Defendants unlawfully arrested him in violation of his Fourth Amendment rights. Barrientos asserts that the arrest was unlawful because the deputies did not have probable cause to arrest him for assault by threat or public intoxication.[11] Additionally, Barrientos argues that Defendants should not be entitled to qualified immunity. However, the Court finds no genuine dispute of material fact and that Defendants are entitled to judgment as a matter of law.

Defendants assert that, considering the totality of circumstances, there is probable cause for assault by threat because Barrientos had threatened to hit his girlfriend before she called the police. Additionally, Defendants argue that they are entitled to qualified immunity because the arrest did not violate a clearly established right.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018) (citation modified). Because arrests

[11] The Court will not further consider public intoxication as a basis for probable cause because, as explained below, there is no genuine dispute of material fact that Defendants had probable cause to arrest Barrientos for assault by threat.

are "seizures of persons, they must be reasonable under the circumstances." *Id.* (citation modified). A warrantless arrest is reasonable "if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *Id.*

Probable cause requires that "the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed . . . an offense." *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996). To decide whether an officer had probable cause for an arrest, courts examine "the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby*, 583 U.S. at 56–57. Further, because probable cause "deals with probabilities and depends on the totality of the circumstances," it is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 57. It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* Further, probable cause still exists even when the actual offense is not "closely related" to the offense stated by officers as a reason for the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004).

Under Texas law, a person commits assault if the person "intentionally or knowingly threatens another with imminent bodily injury." Tex. Penal Code Ann. § 22.01(a)(2). An offense under Subsection (a)(2) is a Class C misdemeanor. *Id.* § 22.01(c).

In *Munajj v. City of Fredericksburg*, the plaintiff brought a Section 1983 Fourth Amendment unlawful arrest claim against the officers for assault by threat. No. 25-50535, 2026 WL 897005, at *2 (5th Cir. Apr. 1, 2026) (unpublished).[12] The Fifth Circuit held that the officers had probable cause because officers knew that the plaintiff had been "involved in heated arguments that led to police involvement" with another person at the time of the arrest. *Id.* Further, dispatch had notified the officers that an armed suspect was at the scene and an individual alleged that the plaintiff had "shown him a gun and threatened to 'f***ing kill him.'" *Id.* Body camera footage also revealed that the plaintiff was aggressively yelling at this individual. *Id.* Considering these facts together, the Fifth

[12] The Court recognizes that because this is an unpublished opinion, it is not binding authority and is only considered for its persuasive value. 5th Cir. R. 47.5.4; *Ballard v. Burton*, 444 F.3d 391 (5th Cir. 2006) ("An unpublished opinion issued after January 1, 1996 is not controlling precedent, but may be persuasive authority.").

Circuit held that there was probable cause to believe that an assault by threat had occurred. *Id.*

Here, the Court finds that the summary judgment evidence establishes probable cause for assault by threat. Barrientos's girlfriend Gloria Alaniz called the police, causing Deputy Martinez and other deputies to report to her house. (Dkt. No. 91-1 at 66). When Deputy Martinez interviewed Alaniz before the arrest, she said, "No, everything was really fine, but he behaves very bad when he drinks…" (Dkt. No. 79-6 at 9). Deputy Martinez asked, "He didn't touch you"? (*Id.* at 10). Alaniz responded, "He wanted to hit me but I told him if you hit me, I am going to call the cops. That's why I called." (*Id.*). Deputy Martinez asked, "So he did not touch you," and Alaniz said, "No. He was going to hit me but when I told him I am going call the cops." (*Id.* at 11). Deputy Martinez asked, "Did he stop right away"? And Alaniz said, "Yes." (*Id.*). Deputy Martinez received Alaniz's call of a domestic disturbance, and he could "immediately smell alcohol" when he arrived on the scene. (Dkt. No. 79-2 at 7, 10). Barrientos was intoxicated and acting aggressively upon Deputy Martinez's arrival. (*Id.*). Deputy Martinez stated he did not know what Barrientos did, but he was not going to "risk him coming back, possibly assaulting her because that's why we were initially there." (*Id.* at 13). Deputy Martinez stated that Barrientos did not want to leave and was agitated, so he made the decision to "take him to jail." (*Id.*).

*Munajj* provides a close analogy to the present case, although the Court acknowledges that case involved stronger evidence supporting probable cause: involvement of a firearm, clear camera footage of parties involved in aggressive arguments, and descriptive language of the arrestee's words and conduct. From an objectively reasonable officer's perspective, the totality of the facts and circumstances in the present case are sufficient for a reasonable person to conclude that Barrientos threatened to hit Alaniz. Based on the interview between Deputy Martinez and Alaniz, a reasonable officer could conclude that Barrientos communicated his subjective intent to hit her through words and conduct. An arresting officer need not know the details of the words and conduct to establish probable cause under a totality of the circumstance. With the additional knowledge that Barrientos was intoxicated and that officers were responding to a domestic disturbance call around 3:00 in the morning, Deputy Martinez

reasonably calculated that he had probable cause to arrest Barrientos for assault by threat. Probable cause requires only a probability of criminal activity, not an actual showing of such activity. Therefore, there was probable cause at the time Deputy Martinez initiated Barrientos's arrest.

Plaintiff's expert Christopher Darcy opines that Deputy Martinez had no probable cause to arrest Barrientos at the time of his arrest. (Dkt. No. 73-2 at 35–38; 73-3 at 6–7). The parties agreed Mr. Darcy would not provide opinions about legal conclusions. (Dkt. No. 98 at 1). The existence of probable cause is a conclusion of law. *United States v. Keller*, 123 F.4th 264, 267 (5th Cir. 2024). Any opinions from Mr. Darcy about the existence of probable cause are stricken from the summary judgment record.

In his partial motion for summary judgment, Barrientos argues there was no probable cause to arrest him for assault by threat without evidence of how threat was conveyed because the "intentionally or knowingly" requirement of the offense could not be satisfied. (Dkt. No. 58 at 17). As previously discussed, the proper inquiry is whether, looking at the totality of circumstances available at the time of arrest, a reasonable police officer could conclude an individual intentionally or knowingly threatened another with imminent bodily injury. The Court has conducted such inquiry and determined that a reasonable officer in Deputy Martinez's position could have concluded Barrientos committed the offense of assault by threat at the time of his arrest. The two cases offered by Barrientos in support of his position are inapplicable to the present situation and consider entirely different issues than the one argued by Barrientos. (Dkt. No. 58 at 17). In *Olivas v. State*, the court held that a victim need not be aware of imminent bodily harm to commit assault by threat, reversing the lower court's finding that there was no probable cause. 203 S.W.3d 341, 350–51 (Tex. Crim. App. 2006). The second case, *Counterman v. Colorado,* involved a Colorado criminal statute for stalking that is wholly inapplicable to this case. 600 U.S. 66, 70–71 (2023). Barrientos's argument demonstrates a misunderstanding of the inquiry under Texas law to determine whether probable cause existed for assault by threat.

In addition to the finding that there was probable cause, the Court further concludes that Deputy Martinez is entitled to qualified immunity on the claim of false arrest. A police officer is entitled to qualified immunity as a shield to Section 1983

liability unless their conduct violated a clearly established constitutional right. *Zorn*, 607 U.S. at 571. The facts material to this issue are undisputed. Deputy Martinez was at the scene of a domestic disturbance call in which Alaniz stated that Barrientos was intoxicated, it was around 3:00 in the morning, and Barrientos had expressed an intent to hit her. Even if probable cause did not technically exist, the decision to arrest Barrientos was a close call and the decision was objectively reasonable, such that not all reasonable officials in Deputy Martinez's circumstances would have then known that his conduct violated Barrientos's constitutional right to be free from arrest without probable cause. Further, Barrientos has neither articulated nor provided authority describing a clearly established right to be free from arrest under circumstances similar to the present case.

Thus, Barrientos's false arrest claim fails as a matter of law because his arrest was supported by probable cause that assault by threat had occurred and because Defendants' conduct is protected under the doctrine of qualified immunity. There remains no genuine dispute of material fact on this issue. Defendants' motions for summary judgment are **GRANTED** on Barrientos's Section 1983 claim for false arrest.[13]

**B. Barrientos's Section 1983 First Amendment Retaliation Claim**

Barrientos also advances a First Amendment retaliation claim against Defendants. Barrientos contends that Deputy Martinez arrested him because he expressed an opinion regarding gender roles. Defendants argue that there was probable cause to arrest Barrientos and that the basis for arrest was not his viewpoint on gender roles. Barrientos asserts that the deputies arrested him in response to his statement, "It's her house, but I am the man, right?"

The First Amendment prohibits government officials from "subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (citation modified). Further, if government officials take adverse

[13] The Court primarily considers whether there was probable cause to support Martinez's decision to arrest Barrientos. The Court finds, based on the summary judgment evidence, that the other deputies did not have knowledge of each fact establishing probable cause, and their assumption that Martinez had probable cause for arrest was reasonable. Defendants Solis, Ramirez, and Gonzalez are also entitled to qualified immunity for the same reasons Defendant Martinez is entitled to qualified immunity. To the extent that Barrientos's claim for false arrest extends to Deputies Solis, Ramirez, and Gonzalez, their motion for summary judgment is granted as well.

action against someone based on an impermissible motive, and other "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," then the injured person may bring a First Amendment retaliation claim. *Id.* (citation modified). To prevail on a First Amendment retaliation claim, the plaintiff must establish a "causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Id.* (citation modified). The motive must cause the injury, and it is not enough to show that "an official acted with a retaliatory motive and that the plaintiff was injured." *Id.* Specifically, "it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 399. (citation modified). Courts often look at whether the same consequences would have occurred if the plaintiff had not engaged in such speech. *Id.*

"[T]he validity of a plaintiff's First Amendment claim hinges on probable cause for [] arrest." *Westfall v. Luna*, 903 F.3d 534, 550 (5th Cir. 2018). If probable cause exists, "any argument that the arrestee's speech . . . was the motivation for arrest must fail, no matter how clearly that speech may be protected by the First Amendment." *Id.* Under *Westfall*, a finding of probable cause is dipositive in the context of the retaliation claim. Probable cause is sufficient to overcome retaliation.[14]

Barrientos's retaliation claim fails as a matter of law because the Court has found that there was independent probable cause for Barrientos's arrest. Any argument that Barrientos's speech on gender roles was the motivation for his arrest must, therefore, fail. *See Westfall*, 903 F.3d at 550.

Therefore, Barrientos's First Amendment retaliation claim fails as a matter of law. There is no genuine dispute of material fact on this issue. Defendants' motions for summary judgment are **GRANTED** on Barrientos's Section 1983 claim for First Amendment retaliation.[15]

### C. Barrientos's Section 1983 Fourth Amendment Claim for the Use of Excessive Force

Barrientos asserts an excessive force claim against Defendants. During the arrest,

[14] At the hearing on June 23, 2026, the parties agreed that Barrientos's First Amendment claim would be foreclosed if probable cause existed to justify the arrest.

[15] To the extent that Barrientos's claim for retaliation extends to Deputies Solis, Ramirez, and Gonzalez, their motion for summary judgment is granted as well.

Deputy Martinez initiated a takedown maneuver by planting his own leg in front of Barrientos's left knee and pulling him over his leg. Barrientos claims that Deputy Martinez used excessive force because the maneuver was excessive and unreasonable. Further, Barrientos claims that other deputies are liable for Deputy Martinez's actions under a theory of bystander liability.

### 1. Legal Standard

For an excessive force claim, the relevant constitutional protection is the Fourth Amendment right to be free from unreasonable seizures. U.S. Const. amend. IV; *see also Pratt v. Harris Cty.*, 822 F.3d 174, 188 (5th Cir. 2016) ("When a plaintiff alleges excessive force during an investigation or arrest, the right at issue is the Fourth Amendment right against unreasonable seizures") (citation modified). To establish an excessive force claim, a plaintiff must show that (1) he suffered an injury, (2) resulting "directly and only from the use of force that was clearly excessive," and (3) "the excessiveness of which was clearly unreasonable." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on the 'facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 157 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

To determine whether the force used was objectively unreasonable, courts look to three factors, often referred to as the *Graham* factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Westfall*, 903 F.3d at 547. As part of this analysis, courts can consider "the seriousness of injury to determine whether the use of force could plausibly have been thought necessary." *Westfall*, 903 F.3d at 549. Officers may also "consider a suspect's refusal to comply with instructions in assessing whether physical force is needed to effectuate the suspect's compliance." *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) (citation modified). Officers must assess "not only the need for force, but also the relationship between the need and the amount of force used." *Id.*

A determination that a plaintiff was "actively resisting arrest" can overcome a situation where the other two *Graham* factors weigh against an officer's use of force. *Solis v. Serrett*, 31 F.4th 975, 982-83 (5th Cir. 2022). In *Solis*, the plaintiff was stopped for

traffic violation and ultimately arrested for public intoxication—a Class C misdemeanor. *Id.* at 982. The severity of the plaintiff's crime was relatively low, weighing against the officers. *Id.* The plaintiff was "wearing an evening dress with laced sandals and armed only with her cell phone," demonstrating she did not pose an immediate threat to the safety of the officers or other. *Id.* Two of the three factors weighed against the officers. Nevertheless, she was hostile and argued with the officers, accusing them of improper racial motivation, and pulled away when the officer asked for her phone. *Id.* at 982–83. The plaintiff also struggled against the officers as they grabbed her arms. *Id.* The Fifth Circuit acknowledged that backing away from and struggling against officers during an arrest amounts to actively resisting arrest. *Id.* This third factor—actively resisting arrest—was the only factor cutting in favor of the officers. *Id.* at 983. This third factor, coupled with the measured speed with which the officers resorted to force, was sufficient for the Fifth Circuit to conclude that the officers' restraint of the plaintiff's arms and a brief takedown were not clearly excessive. *Id.* Further, the Fifth Circuit acknowledged that first two factors—severity of the crime and threat posed to the safety of officers—are "less salient" than whether the plaintiff was actively resisting arrest. *Id.*; *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022).

The Fifth Circuit distinguishes between active and passive resistance of arrest. *Solis*, 31 F.4th at 982. "[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified." *Trammell*, 868 F.3d at 341 (quoting *Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017)). The line at which passive resistance becomes active is not a clear one. *Id.* In *Hanks*, the plaintiff "did not immediately exit his vehicle" and he questioned the basis for the officer's instruction. *Hanks*, 853 F.3d at 742. The officer repeated "his instruction six times during the approximately 45-second exchange," and the plaintiff obeyed. *Id.* Later, when the officer commanded that he go to his knees, the plaintiff took a small step and, "[a]lmost simultaneously with [the plaintiff's] small step," the officer "administered a blow to [the plaintiff's] upper back or neck." *Id.* at 743. The Fifth Circuit held that the force was excessive because traffic violations are minor offenses; there was no immediate threat because the plaintiff was facing away from the officer and he displayed his empty hands; and the plaintiff's resistance was merely passive with no attempt to flee. *Id.* at 746. The officer's use of a "half spear" takedown of

the plaintiff after initial refusals to follow instructions was not justified. *Id.*

In *Westfall*, the officer body-slammed the plaintiff to the ground while the plaintiff did not resist and was completely "immobile" for five minutes. *Westfall*, 903 F.3d at 547. The Fifth Circuit held that the force used was excessive after applying the *Graham* factors. The plaintiff was arrested for interference with public duties, a relatively minor Class B misdemeanor; the plaintiff did not pose a threat to officers; and the plaintiff did not intend to flee but instead was following the officer into the house. *Id.* at 548.

When video evidence clearly shows that a suspect is resisting arrest "by ignoring lawful commands," a use of force, including "a leg sweep," may not be excessive. *Bailey v. Ramos,* 125 F.4th 667, 684 (5th Cir. 2025). In *Bailey*, officers placed both hands on the plaintiff's chest and pushed him, grabbing the plaintiff by his upper body and forcing him to the ground. *Id.* at 673. Then, officers handcuffed him and lifted the plaintiff "into a standing position and placed him up against" the wall. *Id.* at 673. During the process, the plaintiff was yelling and screaming, so officers used a leg maneuver to sit the plaintiff back down after his refusal to sit down on his own. *Id.* at 674. The Fifth Circuit held that the officer's responsive use of force was not objectively unreasonable because the plaintiff, though he was handcuffed, was not complying with officers' "lawful orders to sit down." *Id.* at 684. The Fifth Circuit also reasoned that, "even if there is a genuine and material fact dispute as to whether the takedown procedure did amount to excessive force, [the officer] is still entitled to qualified immunity because the unlawfulness of his conduct was not clearly established at the time it occurred." *Id.* at 681.

### 2. Barrientos's Excessive Force Claim Against Deputy Martinez

Barrientos's excessive force claim against Deputy Martinez is premised on the takedown maneuver that resulted in Barrientos's gruesome leg injury. Specifically, Barrientos argues that Deputy Martinez's use of the maneuver was excessive and unreasonable under the *Graham* factors. Defendants argue that the injury was a freak accident, it did not result directly and only from Deputy Martinez's force, and that the force used was not unreasonable from an objectively reasonable police officer's view. Further, Deputy Martinez argues that an "excessive injury does not mean excessive force." (Dkt. No. 95 at 6). Applying the *Graham* factors, Deputy Martinez's force was not clearly unreasonable.

The first *Graham* factor is the severity of the crime involved. *Graham*, 490 U.S. at 396. In *Solis*, the Fifth Circuit reasoned that a Class C misdemeanor did not constitute a severe crime under the first Graham factor. 31 F.4th at 982-83. Assault by threat is also a Class C misdemeanor under Texas law. Tex. Pen. Code Ann. § 22.01(a)(2). The first factor—severity of the crime involved—weighs against Deputy Martinez.

The second factor assesses whether Barrientos posed an immediate threat to officers or others. *Graham*, 490 U.S. at 396. Barrientos was visibly intoxicated and had communicated his prior intent to strike his girlfriend, Alaniz. Nevertheless, Barrientos was not armed and there was no evidence to suggest that he intended to strike Alaniz or any of the deputies on the scene at the time of the use of force. *See Solis*, 31 F.4th at 982–83 (finding that an unarmed plaintiff that made no move to threaten or attack officers did not pose an immediate threat). The second factor—threat posed to the safety of officers or others—also cuts against Deputy Martinez, though it is a closer call than in *Solis* due to the nature of an assault by threat.

The third factor assesses whether Barrientos was actively resisting arrest or attempting to flee. 490 U.S. at 396. A careful review of the body camera videos, (Dkt. Nos. 79-5-1, 79-5-2, 79-5-3, 79-5-4, 79-5-5), establishes that Barrientos was actively resisting arrest. The deputies attempted to restrain Barrientos by grabbing his arms for approximately fifteen seconds as he struggled against them, repeatedly warning him to relax and that they were going to take him down, before Deputy Martinez resorted to the takedown maneuver. (Dkt. Nos. 79-5-1 at 03:23:33−03:23:48; 79-5-4 at 04:23:33−03-4:23:48; 79-5-5 at 03:23:33−03:23:48). *Solis*, 31 F.4th at 982–83 (concluding the plaintiff actively resisted arrest where she "struggled against the officers as they grabbed her arms."); *c.f. Hanks*, 853 F.3d at 743, 746 (finding the plaintiff passively resisted arrest while facing away from the officer and merely displaying his empty hands). Further, the fact that the deputies could not secure handcuffs on Barrientos until after he was on the ground further justifies Deputy Martinez's use of the takedown maneuver. *Bailey*, 125 F.4th 684. In *Bailey,* the officers had already handcuffed the plaintiff before sweeping his legs out to get him to the ground, and the court held that the force was not unreasonable. *Id.* Before the use of force, Barrientos did not listen to Deputy Martinez's warnings to "calm down," "stop resisting," and that Deputy Martinez would "take [him] down."

Barrientos continued to struggle against the deputies and resist arrest even after Deputy Martinez warned him to calm down and stop resisting.

The contrast between Deputy Martinez's restraint of Barrientos's right hand versus his left hand further establishes that Barrientos was actively resisting with his left arm. The body camera footage shows Deputy Martinez seizing Barrientos's left hand at the inception of the arrest. (Dkt. 79-5-4 at 04:23:33). When Deputy Martinez reaches for Barrientos's right hand, Barrientos initially complies but later struggles against the deputies for approximately fifteen seconds while the deputies continued attempting to apply handcuffs to secure Barrientos. (Dkt. Nos. 79-5-1 at 03:23:33−03:23:48; 79-5-4 at 04:23:33−04:23:48; 79-5-5 at 03:23:33−03:23:48). This reflects active resistance from Barrientos.

Albert Rodriguez, Defendants' expert on law enforcement standards of conduct, is a retired Commander of the Training Academy with the Texas Department of Public Safety who has supervised and instructed the use of force training for state police officers since January 2010. (Dkt. No. 79-4 at 1–2). Mr. Rodriguez states that officers are trained to respond to increasing levels of suspect resistance with increasing levels of force. (*Id.* at 14). The levels of resistance are: (1) no resistance (compliance); (2) non-threatening resistance; (3) threatening resistance; and (4) deadly resistance. (*Id.*). Based on his review of the body camera video, Mr. Rodriguez identifies Barrientos's resistance as "non-threatening resistance," and he states that, in response, officers may use "control holds, pressure points, and similar weaponless strategies as are appropriate and proportional." (*Id.* at 15, 24). He opines that it was appropriate for Deputy Martinez to use a takedown maneuver to control Barrientos in response to Barrientos's non-threatening resistance. (*Id.* at 23–25). Mr. Rodriguez compared the takedown maneuver used by Deputy Martinez to the legitimate takedown maneuver taught at the Texas Department of Public Safety Trooper training program and opined that the two were "the same takedown techniques." (*Id.* at 25–27).

The third *Graham* factor—whether the suspect was actively resisting arrest—strongly favors Deputy Martinez. Further, Deputy Martinez did not immediately resort to the takedown maneuver. *See Solis,* 31 F.4th at 983 (explaining that a measured acceleration to the use of force weighs in favor of a finding that force was not excessive).

Deputy Martinez conversed with Barrientos extensively, unrestrained, and with no use of force before determining that Barrientos was actively resisting arrest in such a way that required a takedown maneuver. Deputy Martinez's measured escalation to the use of force weighs in his favor. After considering the three *Graham* factors, the Court concludes that Deputy Martinez's use of force was not clearly excessive and unreasonable in light of Barrientos's active resistance and Deputy Martinez's measured escalation to the use of force.

The Court acknowledges that the injury suffered by Barrientos was gruesome. The fact finder may consider the seriousness of an injury in determining whether the force used by an officer was excessive. *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009). But in this case it appears that Barrientos sustained a "freak" injury. Defendants' medical expert Dr. Frank Buttacavoli testified, "I am surprised to see the damage structures from" the take down mechanism used by Deputy Martinez. (Dkt. Nos. 79-13 at 3). Dr. Buttacavoli further stated, "Based on my review … it is difficult to understand how the maneuver of being taken to the ground caused this injury." (*Id.*). Defendants' expert Albert Rodriguez also testified that the maneuver used by Deputy Martinez is commonly used by law enforcement officers and that he has never seen this type of resulting injury, stating, "I believe it was just a freak, inadvertent injury." (Dkt. No. 79-3 at 7–8). The extreme nature of the injury suffered by Barrientos in this case does not reflect the extent of the force used by Deputy Martinez.

Regardless of whether the force used by Deputy Martinez was excessive, Deputy Martinez is entitled to qualified immunity because the potential violation of the Fourth Amendment protection against use of excessive force was not clearly established under the facts of this case. Barrientos has not provided controlling authority establishing that Deputy Martinez's takedown maneuver violated a clearly established right. *Bailey*, 125 F.4th at 681 (finding that "even if there is a genuine and material fact dispute as to whether the takedown procedure did amount to excessive force, [the officer] is still entitled to qualified immunity because the unlawfulness of his conduct was not clearly established at the time it occurred."). In *Bailey*, the Fifth Circuit held that there was no clearly established right to be free from a leg sweep takedown maneuver after failing to comply with an order by the police officer. 125 F.4th at 681–82. Barrientos was not

handcuffed or otherwise restrained when Deputy Martinez resorted to the use of force, and Barrientos was actively resisting arrest. *See id.* (explaining that force is excessive against a handcuffed individual only when they are not actively resisting arrest). The right asserted by Barrientos, and asserted in *Bailey*, is not clearly established.

The Court is not convinced by Barrientos's argument that *Bailey* is inapplicable precedent. The takedown maneuver used was similar, and the individuals against whom force was used in *Bailey* and in the present case were actively resisting arrest. (Dkt. No. 90 at 25–27). Barrientos points to what he describes as "clearly-established-law" applicable to the present case: *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008); *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012); *Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013); and *Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017). (Dkt. No. 90 at 27). Each of these cases is sufficiently distinguishable from the present case.

In *Bush*, the plaintiff was handcuffed, subdued, and did not defy an order from officers before the use of force. 513 F.3rd at 502. Barrientos was not handcuffed, not subdued, and was defying orders to "stop resisting" before force was used. The force used in *Trammell* was more excessive than the force used against Barrientos, despite the gruesome injury Barrientos ultimately suffered. 868 F.3d at 337–38 (finding a headlock, tackle, and knee strikes to his body were excessive when officers had the plaintiff pinned with his face in the pavement such that he could not move his arms to comply with orders). In *Newman*, the Fifth Circuit held that the force used was excessive because officers resorted immediately to a taser and nightstick—an escalation that was not measured—unlike the present situation. 703 F.3d at 763. Finally, in *Ramirez*, the Fifth Circuit upheld the district court's finding that—contrary to the instant case—the plaintiff was not actively resisting arrest after reviewing the summary judgment evidence, making the use of a takedown maneuver unreasonable. 716 F.3d at 378–79. Barrientos has not pointed to any sufficiently analogous precedent available at the time of his arrest suggesting that Deputy Martinez's takedown maneuver violated a clearly established right. Without the violation of a clearly established right, Deputy Martinez is entitled to the protection of qualified immunity.

There is no genuine dispute of material fact as to the circumstances of Barrientos's arrest and Deputy Martinez's takedown maneuver. Further, the force used by Deputy

Martinez was not excessive and unreasonable under the circumstances. Barrientos also failed to demonstrate that Deputy Martinez violated a clearly established right, so Deputy Martinez is entitled to the protection of qualified immunity. Defendant Martinez's motion for summary judgment is **GRANTED** on Barrientos's Section 1983 Fourth Amendment claim for use of excessive force.

#### 3. Barrientos's Direct and Bystander Liability Excessive Force Claims Against Deputies Solis, Ramirez, and Gonzalez

Barrientos argues that Defendants Solis, Ramirez and Gonzales are liable for the use of excessive force against him both directly and under a theory of bystander liability. Deputies Solis and Gonzalez both held Barrientos's arm during the attempt to restrain him and placed their knees on him to keep him restrained after the takedown maneuver. Deputy Ramirez helped hold Barrientos's arm during his restraint and handcuffing. Only Deputy Martinez actually performed the takedown maneuver.

This Court has held that Deputy Martinez's takedown maneuver was not clearly excessive and unreasonable under the circumstances. Further, this Court has held that Barrientos has not provided evidence that the force applied violated a clearly established right, entitling Deputy Martinez to the protection of qualified immunity. The force applied by Deputies Solis, Gonzalez, or Ramirez was less than the force applied by Deputy Martinez, consisting of restraining him and then placing a knee on his back after he was on the ground. There is no evidence that the force applied by any of the deputies other than Deputy Martinez resulted in any injury to Barrientos. For the reasons explained in the Court's analysis of the excessive force claim against Deputy Martinez, *supra,* the force applied by Deputies Solis, Gonzalez, and Ramirez was not clearly excessive or unreasonable under the circumstances. Further, Deputies Solis, Gonzalez, and Ramirez are entitled to the protection of qualified immunity for the force applied to Mr. Barrientos for the same reasons Deputy Martinez is entitled to such protection.

Barrientos also claims Deputies Solis, Ramirez, and Gonzalez are liable for excessive force under a theory of bystander liability. Defendants object to bystander liability because Barrientos has not shown "any constitutional violation occurred from arrest and use of force." (Dkt. No 95 at 11).

As Barrientos acknowledges, bystander liability applies in situations where an

officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citation modified). As the Fifth Circuit has held, where there is no constitutional violation for excessive force, there is also no bystander liability for failure to intervene. *Davis v. Cannon*, 91 Fed. App'x. 327 (5th Cir. 2004) ("As Steele's actions did not constitute excessive force, Reed and Campbell are not liable for failing to intervene and protect Davis."); *Mack v. Smith, No. 5:15CV202*, 2017 WL 8217697, at *4 (E.D. Tex. Dec. 29, 2017).

In the instant case, the first requirement for bystander liability—knowledge that a fellow officer is violating an individual's rights—cannot be met. Deputies Solis, Ramirez, and Gonzalez could not have had knowledge that Deputy Martinez was violating Barrientos's rights because the Court has held that the force used was not excessive. Further, Deputies Solis, Ramirez, and Gonzalez are entitled to the protection of qualified immunity to the same extent as Deputy Martinez.

Deputies Solis, Ramirez, and Gonzalez are entitled to summary judgment on the excessive force claim because there is no genuine dispute of material fact that would preclude summary judgment and the elements required for bystander liability cannot be met. Defendants Solis, Ramirez, and Gonzalez's motion for summary judgment is **GRANTED** on Barrientos's Section 1983 Fourth Amendment claim for excessive force under theories of direct and bystander liability.

**D. Barrientos's Rule 56 Partial Motion for Summary Judgment**

In his Rule 56 Partial Motion for Summary Judgment, Barrientos argues that judgment as a matter of law is appropriate on two legal issues relating to his Section 1983 Fourth Amendment claim for false arrest. (Dkt. No. 58). Barrientos argues (1) that there can be no probable cause for assault by threat when there is no evidence of how the purported threat was conveyed, and (2) that a citizen who began custody inside his own home and was asked to come out to his front porch cannot meet the "public place" element of a public intoxication offense. (*Id.* at 4–5). For the reasons already set forth in Section III.A. of this memorandum opinion and order, Barrientos's Rule 56 Partial Motion for Summary Judgment, (Dkt. No. 58), is **DENIED**. The Court has found there was probable cause for the offense of assault by threat considering the totality of the circumstances

available to Deputy Martinez at the time of Barrientos's arrest. The Court did not discuss whether the "public place" element of the offense of public intoxication was satisfied in this case. That issue is moot because the Court found probable cause for the offense of assault by threat.

## IV. CONCLUSION

For the foregoing reasons, Defendant Jose Martinez's Motion for Summary Judgment, (Dkt. No. 82), is **GRANTED.** Defendants Ariel Gonzalez, Jose Ramirez, and Hector Solis's Motion for Summary Judgment, (Dkt. No. 83), is **GRANTED**. Plaintiff Rigoberto Barrientos's Rule 56 Motion for Partial Summary Judgment, (Dkt. No. 58), is **DENIED**. Defendants' Opposed Motion to Exclude or Limit Opinions of Christopher Darcy, (Dkt. No. 73), is **GRANTED in part**.

A final judgment will follow.

It is so **ORDERED**.

**SIGNED** on September 30, 2026.

John A. Kazen
United States District Judge